## MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, Plaintiff,

v.

## ASSOCIATED DRY GOODS CORPORATION, a Virginia Corporation, and a wholly owned subsidiary of May Department Store Company, d/b/a L.S. Ayres & Company, Defendant.

No. S92–2M.

United States District Court,
N.D. Indiana,
South Bend Division.

Jan. 22, 1992.

Richard Morgan, Joseph Fullenkamp, South Bend, Ind., Alan R. Fridkin, Office of Gen. Counsel, MassMutual Life Ins. Co., Springfield, Mass., for plaintiff.

John Obenchain, South Bend, Ind., Stephen J. Horace, Ronald J. Dolan, St. Louis, Mo., for defendant.

## MEMORANDUM AND ORDER

MILLER, District Judge.

On October 25, 1991, Associated Dry Goods Corporation ("ADG") announced that the L.S. Ayres store it operates in the Scottsdale Mall in South Bend, Indiana would be closed as part of a company-wide reorganization. The mall's owner, Massachusetts Mutual Life Insurance Company ("MassMutual"), brings this suit for temporary and permanent injunctive relief requiring ADG to continue to operate the Ayres store for the duration of the twelve years remaining on the Ayres lease. The motion for preliminary injunction was heard on January 9, 10, and 13, 1992. For the reasons that follow, the court concludes that the preliminary injunction should be granted.

Courts ordinarily do not order one party to go through with a contract, because an award of damages for the breach of the contract usually gives the other party everything to which it is entitled. Here, however, the closing of the Ayres store will affect the plaintiff's mall in ways that make an award of damages insufficient. If the Ayres store closes, it simply will not be possible to decide at a later trial what damages resulted from the store's closing and what damages resulted from other factors. The lease's language and surrounding circumstances strongly indicate that the parties to the lease intended the Ayres store to continue to operate as an anchor store during the entire term of the lease, and not just to pay rent. Keeping the Ayres store open may cost the defendant a great deal of money, but the plaintiff must post a bond to insure against that risk. On the other hand, a bond or a later award of damages cannot address the risk to the plaintiff if the injunction is denied.

Courts ordinarily do not enter injunctions that will require the court's long-term involvement, but frequent court involvement is unlikely in light of the Scottsdale Ayres store's eighteen-year history and the defendant's interest in its stores' reputation. Even though no court ever has entered an

injunction like the one sought here, the general rules concerning preliminary injunctions indicate that a preliminary injunction should be issued under the facts presented in this case. Accordingly, the court will grant the plaintiff's motion for a preliminary injunction requiring the defendant to reopen the store and operate it at least until trial. The injunction will become effective when the plaintiff posts security in the amount of $1 million.

### I.

The court has jurisdiction under 28 U.S.C. § 1332. MassMutual is a corporation organized and existing under the laws of Massachusetts, having its principal place of business in Springfield, Massachusetts. ADG is a Virginia corporation with its principal place of business in Missouri, doing business in Indiana as L.S. Ayres & Company. ADG is a wholly-owned subsidiary of May Department Stores Company, a New York corporation with its principal place of business in Missouri.[1]

### A.

On October 4, 1971, Ayres Department Stores, Inc. (ADG's predecessor in interest) entered into a lease with an Ohio limited partnership,[2] to lease portions of the Scottsdale Mall, which was in the developmental stage. The Ohio partnership contracted as landlord and Ayres Department Stores, Inc. contracted as tenant of the building known as the Ayres building. The lease provided for the landlord's construction of an enclosed shopping center and gave the tenant additional rights to the mall and common areas as defined in the lease agreement. The term of the lease for the Ayres building commenced on August 1, 1973 and terminates on January 31, 2004,

with renewal options. The lease binds the original parties' assignees and successors in interest.

The plans and specifications for the construction of the Ayres building were prepared in accordance with the tenant's specified designs; both the landlord and the tenant approved the plans and specifications.

The base rental rate for the Ayres building is approximately $254,000 per year for the thirty year lease, a figure that remains constant throughout the lease term. ADG also pays the landlord dues for membership in the mall's merchants' association and is billed a variable annual sum for maintenance of the mall's common areas. ADG also pays the real estate taxes on its building directly to the county treasurer, rather than to the landlord.

ADG (or its predecessor) has operated a department store in its space at Scottsdale Mall since 1973. MassMutual is the current successor landlord under the lease, having accepted a conveyance of the shopping center and assignment of all leases in lieu of foreclosure effective February 27, 1991. ADG, having assumed the prior tenant's obligation, is the Ayres building's current tenant.

Scottsdale Mall contains 658,000 square feet of gross leasable floor area on two levels. Scottsdale Mall has three anchor stores; Ayres, Montgomery Wards and Target.[3] Ayres and Wards are on both levels, while Target has no second level. Tenants presently occupy 81% of the mall's gross leasable floor area. The Ayres store occupies 109,700 square feet of floor space, almost one-sixth of the mall's gross leasable floor area. If the Ayres store is vacated, the occupancy rate of the gross leasable

---

1. May Department Stores was the original defendant. At the hearing on the preliminary injunction motion, ADG was substituted for May as the proper party defendant with the stipulations that ADG waived service of process and that May could be added anew, subject to any existing injunction, if later events indicated that May was the proper defendant.

2. The partnership called itself "Scottsdale Mall". To avoid confusion between the partnership and

the shopping center, the court will not refer to the partnership by name in the text of this memorandum.

3. At the time of the mall's construction, the Target store was an Ayr–Way store owned and operated by Ayres Department Stores, Inc. ADG, which now owns and operates the Scottsdale Ayres store, does not own or operate the Scottsdale Target store.

floor area will be reduced to 63%. As measured by storefronts, Scottsdale has an occupancy rate of about 60%, with forty-seven of the 107 storefronts vacant.[4]

### B.

A second enclosed traditional regional shopping mall, University Park Mall, opened in the South Bend area around 1980, about seven and a half miles from the Scottsdale Mall. The two malls are in direct competition. According to ADG's merchandising information, the areas from which its Scottsdale and University Park stores draw the majority of their customers overlap significantly. Scottsdale's area of exclusive influence is a comparatively small, sparsely populated area.[5]

To date, University Park generally has been a more successful shopping mall than Scottsdale. University Park has a much higher storefront occupancy rate,[6] is considerably more profitable based on sales per square foot, is much larger and has more anchor tenants (four), is newer, and attracts many more customers than Scottsdale.

Ayres is the only department store to operate anchor stores at both Scottsdale and University Park, although the two malls have thirty-one non-anchor "specialty shops" in common. The decision to open the second store was made when the University Park Mall was being developed and was made by ADG's predecessor in interest. Based on the relevant demographics, sales figures, and trends, ADG believes that the South Bend market cannot support two Ayres stores.

ADG has made various marketing decisions based on the merchandising history of the two stores. It has found that higher-priced, higher-quality product lines do not sell as well at Scottsdale as at University Park. Accordingly, the two stores carry varying product lines, with the higher-priced, higher-quality product lines generally being more available at University Park, and lower-priced lines generally being more available at Scottsdale.[7]

ADG's University Park Ayres store sells more than two and one-half times as much merchandise as its Scottsdale store. Sales per square foot at the University Park Mall are more than double that of the Scottsdale store and the gap is widening.[8] The Uni-

---

4. Food vendors and banks, rather than retailers, occupy some of the storefronts. Evidence presented at the hearing indicated that ADG has no Ayres store at any other Indiana mall with so high a storefront vacancy rate.

5. During the hearing, MassMutual introduced into evidence its Exhibit 4, a tally of shoppers' response to a survey conducted by mall management over a two to three week period in the late summer of 1991. MassMutual offered the tally to show the income and shopping preferences of Scottsdale shoppers. ADG moved to strike the exhibit as hearsay.

The motion to strike is denied; "hearsay can be considered in entering a preliminary injunction." *S.E.C. v. Cherif,* 933 F.2d 403, 412 n. 8 (7th Cir.1991). However, the court attributes little weight to the exhibit in light of the extremely unscientific nature in which the poll was conducted. Persons who approached the mall's information booth were asked to respond. Accordingly, the tally shows nothing more than a profile of shoppers who (1) needed information or a stroller and (2) agreed to take the time to respond. It seems apparent that, stroller needs aside, the shopper most familiar with the mall would be the least likely to need the services of the information booth.

6. Scottsdale's storefront occupancy rate is approximately 60% as compared to University Park's occupancy rate of approximately 95%. No evidence was introduced concerning University Park's occupancy rate based on gross leasable area.

7. For example, the Liz Claiborne product line produces 2% of the overall gross sales of the Ayres' chain, but was removed from the Scottsdale store due to slow turnover of that line's inventory. The Liz Claiborne product line is available at University Park but not at Scottsdale.

As suggested by questioning by plaintiff's counsel at the hearing, these marketing decisions likely influence the two stores' marketing areas discussed above. Some portion of the overlap of the stores' marketing areas doubtlessly reflects Scottsdale Ayres shoppers who go to University Park for higher-quality product lines that are not available at Scottsdale. The record does not permit even an approximation of that percentage.

8. In 1990, the Scottsdale Ayres store produced $129 in sales per square foot. The University Park store produced $275 in sales per square foot. The 300 department stores May operates

versity Park store grew by 49% in volume of sales from 1984 to 1990, while the Scottsdale store's volume of sales was $10.7 million in 1984 and 1990.[9] The Scottsdale store realized profits of about $250,000 in 1988, about $200,000 in 1989, and about $320,000 in 1990. Although year-end figures for 1991 are not yet available, the Scottsdale store lost $120,000 during the "spring season" (February through July). ADG believes that the Scottsdale store has avoided yearly losses thus far only because of its efforts to reduce costs to a bare minimum, and that the University Park store is stronger because the University Park Mall is stronger.

## C.

MassMutual placed a $17.3 million book value on the mall upon acquisition in 1991. In May, MassMutual contracted with the Dial Companies to manage the Scottsdale Mall, and Dial's major tenant lease coordinator, J.F. Carter, telephoned May senior vice president in charge of real estate, Duane R. Vaughan, to introduce himself. Mr. Carter and Mr. Vaughan scheduled a meeting to discuss Dial's future plans for the Scottsdale Mall. Mr. Carter and two Dial vice presidents later met with Mr. Vaughan during a trade show in Las Vegas. Dial presented its redevelopment plan for the Scottsdale Mall [10] and Mr. Vaughan requested updates on the redevelopment plan. Mr. Vaughan does not remember seeing the materials presented to him; the court infers that Mr. Vaughan, who already was seeking a substitute tenant at Scottsdale, simply paid little attention.

After that meeting, MassMutual allocated funds for the first phase of Dial's redevelopment plan. Thus far, Dial's marketing efforts have failed to sign any new tenants, although leases have been tendered to prospective non-anchor tenants; a few non-anchor tenants, known as "specialty shops", have left Scottsdale since MassMutual and Dial took over.

On October 25, 1991, May (ADG's parent company) held a press conference and announced it would close the Scottsdale store by the end of January, 1992 as part of a major reorganization. Neither Dial nor MassMutual knew of this decision until the public announcement. Mr. Vaughan testified that in light of the broader ramifications of the corporate reorganization, he could not disclose the plans to Dial before the public announcement. Mr. Carter tried to telephone Mr. Vaughan to arrange a meeting to discuss the reason for closing the Scottsdale store and to try to resolve the dispute. The meeting was cancelled twice due to Mr. Vaughan's scheduling problems, and ultimately occurred on November 25. At that meeting, Mr. Carter and two other Dial representatives met with Mr. Vaughan in Dial's Omaha offices. Mr. Vaughan rejected Dial's proposals to keep the Scottsdale store open and operating. Mr. Carter told Mr. Vaughan that Dial was interested in seeking a resolution, but MassMutual would file legal proceedings if the matter remained unresolved in thirty days.

Since the announcement of the intent to close the store, ADG has proceeded, according to a schedule prepared in November, to take the many steps necessary to close the Scottsdale Ayres store, including discontinuing all merchandise orders for the Scottsdale store, terminating contracts with parties subleasing or licensing floor space in the premises, transferring employees and offering early retirement to others, delivering "WARN" (plant closing) notices to employees, and disposing of most of its visual trade fixtures. ADG has neither slowed nor accelerated its closure schedule

produced an average of $217 in sales per square foot.

9. Gross sales at the University Park Ayres store were approximately $24 million in 1990.

10. MassMutual's redevelopment plan consists of two phases: the first phase would cost between $3.5 million and $5 million, and the second phase would cost another $12 million. The first phase includes aesthetic renovations, parking lot repairs, upgrading of lighting and signs, development of a food court, and expansion of Scottsdale Mall's movie theater. Phase two includes construction for a fourth anchor tenant.

as a result of these proceedings.[11]

ADG also has represented to the public in advertisements that it was conducting a liquidation sale in connection with closing the Scottsdale store. As part of this process, ADG transferred $700,000 to $800,000 of "distressed" merchandise (or about 25% of the Scottsdale store's December inventory) to its Scottsdale store in the first half of December.[12] On December 20, ADG applied for a "removal of business" sale license from the county clerk's office; all inventory shipments to the Scottsdale store ceased on that date.[13] The license issued with an effective date of January 9, 1992. On December 26, merchandise worth approximately $3.8 million was in stock in the Scottsdale store, which was similar to the amount of stock maintained a year earlier, and ADG still retained all fixtures, visuals, and its full employee staff at the Scottsdale store. On December 26, ADG began a "Consolidation Sale" at the Scottsdale Ayres store.

By January 13, merchandise totalling $2.9 million had been sold at the Scottsdale Ayres store; less than 23% of the December 26 inventory remained in the store. But for the intended closing, the store would have had between $3.5 million and $4 million in inventory; January and February are among the low times in the retail industry. The remaining inventory could not form the base for a re-stocked inventory. As of January 10, the Scottsdale Ayres store still had 75% of its fixtures and 10% of its visual fixtures; the rest had been discarded or sent to other stores, where other fixtures were discarded. Of six area sales managers, one had left the company and another plans to retire. One of its two sales support managers is still associated with L.S. Ayres, and only four of fifty-six

regular associates intend to retire. The remaining sales associates have been transferred, await transfer, or hope to transfer to other stores, most to the University Park store.

ADG anticipated closing the store on January 20. The parties agree that the requested injunction essentially would require ADG to open a new Ayres store at Scottsdale.

These findings of fact are not intended to be complete. Additional facts are set forth where pertinent in the sections that follow.

### D.

On December 27, MassMutual filed its Verified Complaint in the St. Joseph County Circuit Court,[14] seeking preliminary and permanent injunctive relief and a temporary restraining order. The hearing on the motion for the temporary restraining order was set for January 3, 1992. On January 2, ADG removed this cause to this court and requested a continuance of the TRO hearing. The court denied the request for a temporary restraining order following an evidentiary hearing, due to the imminence of the scheduled January 9 hearing on the motion for preliminary injunction.

ADG denies any present intention to stop paying rent at the Scottsdale store, but strongly denies that it has any lease obligation to operate a store at Scottsdale Mall. MassMutual contends that the lease requires ADG to operate a store in addition to paying rent, and asks this court to order it to do so. Section 23.16 of the lease provides that Indiana law shall apply. Because the contract was to be performed in Indiana, an Indiana court ordinarily would give effect to the contractual choice of law

---

11. The court is troubled, however, that ADG's Ayres store manager testified at the TRO hearing that the store would close on only one day, January 7, for inventory; the store actually was closed on January 7 and 8, reopening on January 9 with its liquidation sale.

12. At the TRO hearing, ADG's Scottsdale Ayres store manager testified that the store received $70,000 to $80,000 in merchandise, but at the preliminary injunction hearing, a senior May official produced the higher figure.

13. MassMutual suggested at the hearing that ADG violated IND.CODE 25–18–1–10 by receiving inventory at the Scottsdale store within sixty days of the issuance of the license, and that the license may have been altered immaterially after its issuance, but these issues appear to be irrelevant to the matters before the court.

14. The county courts were closed on December 25 and 26.

provision, *Wood v. Mid–Valley, Inc.*, 942 F.2d 425, 426 (7th Cir.1991); *Sullivan v. Savin Business Machines Corp.*, 560 F.Supp. 938 (N.D.Ind.1983), and the parties have not suggested any basis for applying the law of any other jurisdiction. Accordingly, the court will apply Indiana law to the substantive issues. *Dyna–Tel, Inc. v. Lakewood Engineering & Manufacturing Co.*, 946 F.2d 539 (7th Cir.1991); *see also Systems Operations, Inc. v. Scientific Games Develop. Corp.*, 555 F.2d 1131, 1143 (3rd Cir.1977) (state law provides source of rule of substantive elements of claim).

## II.

■■■ A preliminary injunction's purpose is to minimize the hardship to the parties pending the lawsuit's ultimate resolution. *Faheem–El v. Klincar*, 841 F.2d 712, 717 (7th Cir.1988) (en banc). Although Indiana law governs the parties' substantive rights in this diversity suit, federal law governs the issuance of a preliminary injunction. *General Electric Co. v. American Wholesale Co.*, 235 F.2d 606, 608 (7th Cir.1956); *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 799 (3rd Cir.1989), at least in the absence of a state statutory bar to the relief sought. *See Sims Snowboards, Inc. v. Kelly*, 863 F.2d 643, 647 (9th Cir.1988).

■■■ In this circuit, one seeking a preliminary injunction bears the burden of showing: (1) that the movant will suffer irreparable harm absent the preliminary injunction; (2) that the harm the movant will suffer absent injunctive relief is greater than the harm the defendant will suffer as a result of injunctive relief; (3) a reasonable likelihood of success on the merits; and (4) that the injunction will not harm the public interest. *S.E.C. v. Cherif*, 933 F.2d 403, 407–408 (7th Cir.1991). An injunction is improper if the movant has an adequate remedy at law. *United States v. Rural*

*Electric Convenience Co-op., Inc.*, 922 F.2d 429, 432–433 (7th Cir.1991). The plaintiff must satisfy each of these elements. *Somerset House, Inc. v. Turnock*, 900 F.2d 1012, 1015 (7th Cir.1990).

The court turns to each factor in turn.

## A.

■■ MassMutual has demonstrated that the closing of ADG's Scottsdale Ayres store will cause MassMutual irreparable harm for which no adequate remedy exists at law. Even assuming that ADG continues to make all payments due to MassMutual under the lease, including real estate tax payments directly to the county clerk, the store's closing will damage MassMutual significantly in a number of ways.

### 1.

MassMutual has shown that the store's closing will adversely affect the mall. The extent of the damage to the mall's overall operation cannot be predicted with certainty, but damage certainly will ensue. The Ayres store attracts a more affluent customer than do the store's other anchors; fewer customers of that sort will come to the mall to shop at Wards or Target.[15] The reduction in customers coming to Scottsdale Mall will reduce the flow of customer traffic through the mall, reducing the sales business of all mall tenants. Those hardest hit will be the specialty shops that are geared to the more affluent customer and the shops located closest to Ayres.

Evidence produced at the hearing indicates that a shopping mall is based on the concept of facilitating a unified and a compatible operation between the landlord, anchor tenants, and specialty shops. The specialty shops rely on the anchor tenants to draw a substantial portion of the customer base to the mall, and customers of any one place of business in a mall are potential

---

**15.** ADG presented testimony of a study done several years ago concerning the profile of Target's customers; that study indicated that Target draws the same sort of "upscale" customer as does Ayres. MassMutual presented testimony to the contrary from specialty store operators at Scottsdale; the testimony of Scottsdale Mall shop owner Robert Gross particularly impressed the court on this point. Because the issue before the court relates to Scottsdale Mall, rather than to the nature of customers Target stores may bring in in other areas, the court finds MassMutual's evidence to be more persuasive.

customers of any of the other merchants in the mall.

Testimony presented at the hearing establishes that the specialty shops at Scottsdale that cater to the more affluent customer benefit from the Ayres store's presence at the mall. Testimony from owners and managers of such stores indicates that shoppers go to the mall in response to Ayres advertising and then go on to shop at those specialty stores. Testimony of persons intimately familiar with specialty shops that cater to the more affluent Scottsdale customer indicates that the anchors other than Ayres draw a generally less affluent customer to the mall. Observations of increased customer traffic in the mall during advertised Ayres sales corroborate those beliefs. Two scenarios are probable without the Scottsdale Ayres store: either fewer higher income customers will shop at Scottsdale, reducing those specialty shops' gross sales, or those specialty shops will find it necessary to increase their own advertising efforts. Even if additional specialty shop advertising is successful, the expense of additional advertising will reduce the shops' profits.

If the upscale specialty shops suffer reduced gross sales, MassMutual's rental income will suffer. All but four or five of the mall's non-anchor tenants have lease arrangements whereby the tenant pays a minimum base rent, but pays a percentage of gross sales if sales reach a specified point. Thirteen non-anchor tenants paid mall rental on a percentage basis in 1991; an unspecified number of other non-anchor tenants fell just short of sales levels that would have required rent payment on a percentage basis. If the Ayres store's departure causes specialty shops' gross sales to fall, MassMutual will lose: (1) the additional percentage rent that previously successful non-anchor tenants, who have paid percentage rent in the past, would have paid in the years remaining on the Ayres lease; (2) the potential for increased percentage rent from increased future sales from those non-anchor tenants already paying percentage rent; and (3) additional percentage rent that other non-anchor tenants, who now pay the base rent, may have owed

as a result of increased sales in coming years.

Similarly, the closing of the Ayres store will prevent the mall from offering prospective new tenants a draw for the customer more likely to shop at an Ayres-like store than at Wards or Target. Accordingly, specialty shops that cater to the more affluent Ayres customer will be less likely to decide to enter the mall.

If the upscale specialty shops simply maintain present sales by increasing their advertising, the cost of doing business at Scottsdale Mall will increase. Unchanged sales combined with increased costs reduce profits. If it becomes less profitable for specialty shops to operate, those shops may consider non-renewal of their leases at expiration or renegotiation, as the owner of one shop indicated at the hearing. Sixteen of the sixty-seven presently operating non-anchor stores' leases, or more than one-third, expire in the next two years, a period in which it is highly unlikely that any replacement for the Ayres store could begin operating. All present non-anchors' leases will expire during the twelve years remaining on the Ayres lease. Persons knowledgeable of some of the specialty shops, such as Richman Brothers, indicated that leases would not be renewed if the Ayres store leaves and no substitute anchor tenant is found quickly.

Indeed, at least some specialty shops need not await their leases' expiration before reconsidering continued operation at the Scottsdale Mall. The Lerner Shops lease provides that if any of the mall's anchors ceases operation for twelve months, the tenant may terminate the lease on thirty days notice. The Sycamore Shops lease provides that if any anchor vacates and is not replaced within one year, the tenant may terminate on ninety days notice. The J. Riggins lease provides that if the Ayres store closes and is not replaced by a similar store within one year, the tenant may terminate on thirty days notice. The Nu–Vision lease provides that if 75% of the mall's leasable area becomes vacant, the tenant's rent abates; the Ayres store's closing would produce a 64% occupancy

rate at Scottsdale Mall, and the non-anchors whose leases expire in the next two years occupy another 6% of mall's leasable area. Other non-anchor leases, such as that of Radio Shack, contain provisions allowing cancellation if an anchor closes. The possibility that non-anchor tenants will vacate is not remote: MassMutual received two termination notices during the week preceding the preliminary injunction hearing.

### 2.

A second likely impact of the Ayres closing extends beyond the specialty shops who cater to the more affluent customer. Scottsdale Mall is arranged on an essentially east-west basis, with the Wards store on the east end and the Target store on the west end; the Ayres store is located in the center of the linear arrangement. Testimony at the hearing indicated that shopping malls should be designed so as to maximize customer traffic flow through the mall. The Ayres store's closing probably will have a dramatic impact on the mall's customer traffic. Shoppers no longer will exit the Ayres store on the mall's first or second level and then turn east or west, passing specialty shops on the way to another anchor. Mall traffic will consist of (1) shoppers entering the mall at the west end, into or near the Target store, (2) shoppers entering the mall at the east end, into or near the Wards store, or (3) those who enter the mall to shop at a specialty store. Evidence at the hearing indicated that because the specialty shops rely on the anchors' advertising to bring customers to the mall, the third group will be far smaller than the first two.

Shoppers who enter the mall at either end will be less likely to move toward the mall's middle if the Ayres store closes. Reduced customer traffic in the mall's center probably will have the greatest impact on the sales of specialty shops located in the center of the mall; those shops will begin to close or leave at the expiration of their leases. As specialty shops in the mall's center dwindle, shoppers will have even less reason to move toward the mall's center, and more shops located there will

close; shoppers are unlikely to walk great distances past empty shops to go to the more distant anchor. In essence, Scottsdale Mall would become two small malls, with a small number of specialty shops clustered near each operating anchor. Because the Target store only occupies one level, there would be few, if any, second-floor specialty stores at the Target end.

### 3.

A third impact will be upon the mall's image itself. As noted before, more than a third of the mall's leasable area will be vacant if ADG closes the store occupying 107,900 square feet. All of the witnesses who expressed an opinion on the issue at the hearing agreed that a mall with a great vacancy rate faces far more difficulty in attracting shoppers and new tenants. Developments since ADG's announcement demonstrate the accuracy of that testimony. Before the announcement of the intended closing, MassMutual was in negotiation for a fourth anchor, for an expansion of the mall's theater from two screens to six screens, and for the development of a nine-vendor, 15,000 square foot food court. After the announcement, the prospective fourth anchor abandoned its interest in Scottsdale Mall, the theater expansion has been placed on hold pending re-negotiation, and the food court project has been suspended. None of these developments had culminated in an agreement before ADG's announcement, and perhaps none would have done so, but the announcement's impact on the talks demonstrates the damage to the mall's ability to attract new tenants. As a result of ADG's announcement, MassMutual has virtually stayed its redevelopment plan for the mall.

### 4.

ADG suggests that its closing actually may benefit the mall in the long term by allowing it to procure a new, more profitable tenant. It is true that were a new anchor found, the anchor lease's rental provisions likely would be more favorable to the landlord than those contained in the 1973 Ayres lease. It also may be that if another anchor replaces the Ayres store, other specialty shops, more complementary

to the new anchor, may replace the current non-anchors whose customer base mirrors that of the Ayres store; indeed, a new "tenant mix" ultimately could, conceivably, make the mall's operation more profitable. ADG has demonstrated no likelihood, however, that a substitute anchor can be found for its Scottsdale store.[16]

Although the lease creates no obligation to do so, ADG itself has made inquiries of other potential anchors, starting as long as three years ago,[17] but has met with no success. The May Department stores will not put another of their stores into the space. Due to the timing of ADG's announcement and lack of prior notice from ADG, MassMutual was in no position to seek a replacement before ADG's announcement. As a result, the Ayres space, even under the best of circumstances, will be vacant for several years.

Credible evidence presented at the hearing indicates that the process of acquiring an anchor is a lengthy one. A business with interest in the project must be found; the potential anchor's representatives must tour the facilities and the market and conduct feasibility studies; negotiations over the lease's terms must occur; the potential anchor must develop architectural drawings for its use of the space; renovations must be made to the anchor's specifications. If a substitute anchor were located tomorrow, the substitute anchor could not open its doors at Scottsdale before February 1994; in today's economy, even that timetable is unlikely. As noted before, at least sixteen non-anchor leases will have expired by that time, and the mall's customer traffic probably will have been drastically affected in the interim.

Even after a new anchor begins business, a period of time is necessary for the new anchor to establish itself in the community. Ayres, the store the new anchor would replace, has been long known in Indiana and has enjoyed, at least before the closing announcement, a very good reputation in the state. If a new anchor could be found, customer traffic at the mall would reflect the time needed for a replacement anchor to establish its own reputation and customer confidence. In the meantime, Scottsdale would continue to lose customers, battling its reputation as a vacant mall.

5.

Accordingly, MassMutual has shown that it will be injured if the Ayres store closes. To obtain a preliminary injunction, it must further show that the injury is irreparable. *Scruggs v. Moellering*, 870 F.2d 376, 378 (7th Cir.), *cert. denied*, 493 U.S. 956, 110 S.Ct. 371, 107 L.Ed.2d 357 (1989). In *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386 (7th Cir.1984), the court explained this requirement as meaning that the plaintiff cannot wait until the end of the trial to get relief. MassMutual has satisfied that standard. The injury may well amount to the closure of the mall, except to the extent of the two remaining anchors and a few nearby specialty shops. Should this develop from non-renewal of non-anchor leases, it may not happen for several years; if it results from specialty stores becoming unable to survive financially, it may, as plaintiff's expert Donald Harney suggested, happen within a year. If the former course is taken, damages will be unknown at trial unless the trial is unreasonably delayed; if the latter course is taken, Scottsdale virtually will have ceased to exist as a shopping mall.

All of MassMutual's loss will be financial. Loss of new tenants is compensable in damages equal to the profits MassMutual would have made from those tenants; loss of rent from existing tenants is compensable in damages equal to the rents

---

16. Defense expert Michael Kelly testified to four Chicago area malls that were left with two or fewer anchors when Wieboldt's went into bankruptcy. Those malls continue to operate. He also, however, identified the same malls as still having a vacant anchor store. Mr. Kelly acknowledged that finding a replacement anchor store would be difficult in the present economy. His testimony further suggests that replacing a third anchor may be more difficult than replacing a fourth or fifth.

17. Mr. Vaughan testified that he made inquiries three years ago with an eye toward "recycling" the Ayres store. "Recycling" involves subletting to one or more other tenants, subdividing the leased premises if necessary.

MassMutual would have received had ADG not closed its Scottsdale store; loss of rent due to closures and non-renewals by existing tenants is compensable in damages equal to the rents MassMutual would have received from those tenants had ADG not closed its Scottsdale store. The reduction in fair market value may be quantifiable, and ADG demonstrated that expert witnesses can be found who claim the ability to isolate a given cause. As noted above, preliminary injunctive relief ordinarily is inappropriate if damages are sufficient to remedy the injury of which a plaintiff complains. *American Hospital Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir.1980); *see also Indiana State Board of Public Welfare v. Tioga Pines Living Center, Inc.*, 575 N.E.2d 303, 306 (Ind.App.1991) (Indiana law); *Whiteco Industries, Inc. v. Nickolick*, 549 N.E.2d 396, 399 (Ind.App.1990) (Indiana law). In other words, to obtain a preliminary injunction, MassMutual must show not only that it will suffer injury without the injunction; it also must show that an award of damages for those injuries would be an inadequate remedy.

■ A damages remedy is inadequate if it would come too late to save the plaintiff's business, or if the nature of the plaintiff's loss makes damages very difficult to calculate. *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d at 386; *see also Classic Components Supply, Inc. v. Mitsubishi Electronics America, Inc.*, 841 F.2d 163, 165 (7th Cir.1988); *but see Indiana State Dept. of Welfare, Medicaid Div. v. Stagner*, 410 N.E.2d 1348, 1352 (Ind.App.1980) (Indiana law). To describe MassMutual's damages as difficult to calculate seriously understates the circumstances presented at the hearing.

Scottsdale's present circumstances demonstrate that more is afoot than ADG's plan to close the Scottsdale store. MassMutual owns the mall today because it took the mall in lieu of forfeiture less than a year ago, when the prior owners were unable to meet their debt service from the mall's cash flow. Although some stores such as Richman Brothers and Shifrin Jewelers have done well in recent years, forty-seven of the mall's 107 non-anchor storefronts presently are vacant; the vacancy rate has doubled, more or less, in the past five years. Thus, even before ADG's announcement, the mall's short-term trend was toward non-renewal of non-anchor leases. Even MassMutual's expert testified at the hearing that a 40% vacancy rate is unacceptable.[18] Storefronts near the Ayres store on the mall's second floor already are vacant, and specialty shops that appeal to the "upscale" customer, such as Gantos, The Gap, Gilbert's, and Redwood & Ross, have closed their Scottsdale stores in the past several years. The present mall manager attributes the recent loss in leased square footage to a predecessor management company's improper management and effort; a former manager of the mall believes the recent downturn was caused by uncertainty in development due to long-delayed decisions about a new highway near Scottsdale Mall.

The Scottsdale Ayres store itself was among the three least profitable of the fifteen pre-consolidation Ayres stores; credible testimony was presented at the hearing that drastic cost-cutting was necessary to allow the store to show any profit in the past three years. On the other hand, projected 1991 sales of the non-anchor Scottsdale stores are expected to show a slight increase over 1990, which may show strength in the face of a recessionary economy.

The Scottsdale Mall is located less than eight miles from a newer and far more successful shopping mall, University Park Mall. University Park, which has four anchors (Ayres, Sears, J.C. Penney, and Hudson's), has a vacancy rate of 5%, compared to Scottsdale's nearly 40%. ADG's Univer-

---

**18.** Lack of uniform terminology made some testimony at the hearing misleading. Scottsdale's vacancy rate is 40% if judged on the number of vacant non-anchor storefronts; the Ayres store's closing would have a minuscule effect on that figure. Scottsdale's vacancy rate is 19% if judged on the basis of gross leasable area; the Ayres store's closing would increase that figure to 37%. No witness, however, testified that Scottsdale's present occupancy/vacancy rate is satisfactory by any standard.

sity Park Ayres store shows much higher sales per square foot, a phenomenon mirrored by other chains, such as Richman Brothers, that operate stores at both malls.

Conflicting evidence was presented concerning the demography of the Scottsdale market. The average household income in the area immediately surrounding the mall was more than a third higher than the average for the eleven-county marketing area as a whole, and the councilmanic district in which the mall is located contains many of the city's wealthiest neighborhoods. There has been recent commercial development in the area immediately surrounding Scottsdale, and new residential developments involving more than 2,500 housing starts are planned for the coming decade. A major highway recently was completed adjacent to the mall, linking the mall's area to a city in an adjacent county with 45,000 people. On the other hand, no substitute anchor has been found despite these apparently favorable demographics.

May's experts believe that a population of 250,000 is needed to support one of its stores. Accordingly, a population of 500,000 would be needed to support the two Ayres stores at Scottsdale and University Park. The core population of the South Bend metropolitan area is 250,000, although adjacent communities would expand that figure somewhat. Of that population, ADG's studies of its charge account records indicate that the two stores' primary trading areas share about 150,000 people, an unusually large overlap. The University Park store's trading area has a considerably larger population than does the Scottsdale store. May's experts believe the South Bend metropolitan market is too small to support two Ayres stores or two regional shopping malls.[19]

ADG presented evidence that Scottsdale Mall's design and present tenant mix may be responsible for the mall's troubles, with a one-story anchor (Target) located at one end of the mall and an assertedly confusing co-existence of an "upscale" department store (Ayres) and a discount store (Target) as anchors.[20]

MassMutual presented expert testimony to the effect that Scottsdale might "go dark" (close altogether) within a year of the Ayres store's closing. Again, conflicting testimony was presented on this issue. ADG's experts testified to several instances in which malls have lost anchor stores and continue to operate. Those instances seem easily distinguishable from the Scottsdale situation. Apart from malls that changed to off-price centers, the instances cited by ADG generally involved the closing of anchor stores (such as Miller & Rhoads, Wieboldt's, Bonwit Teller) due to bankruptcy. The Ayres chain is not going bankrupt; ADG intends to continue operating an Ayres store at a nearby, competing shopping mall. ADG reports post-announcement comments from shoppers indicating that its customers will shop at University Park because they like Ayres.[21] Thus, Scottsdale faces a double whammy: like the malls cited by ADG as having survived the loss of an anchor, Scottsdale will face the future with one fewer anchor store; unlike the malls cited by ADG, the customer base developed at the Scottsdale Ayres store will take its business to University Park.

Nonetheless, each of the ADG experts testified that they were unaware of any regional shopping mall that went completely "dark" upon losing an anchor tenant, and MassMutual identified no example of such an occurrence. Under these circum-

---

19. The record suggests that it was ADG's predecessor in interest that decided to open the University Park store. In essence, ADG's evidence, viewed most favorably to Ayres, establishes only that several years ago, Ayres made a bad business decision to compete with itself in too small a market. Under Indiana law, a landlord does not assume the risk of a tenant's poor business decisions. *Madison Plaza, Inc. v. Shapira Corp.,* 387 N.E.2d 483, 485 (Ind.App.1979).

20. ADG's predecessor in interest, of course, is as responsible as MassMutual's predecessor in interest for these circumstances; the one-story discount store anchor originally was an Ayr-Way.

21. May's Chief Financial Officer testified at the TRO hearing that he expected the University Park store to capture 30% to 40% of Scottsdale's gross sales after the closing.

stances, the court cannot find that Mass-Mutual has made the sort of "concrete showing" required to warrant injunctive relief due to Scottsdale's probable future closure. *See USA Network v. Jones Intercable, Inc.*, 704 F.Supp. 488, 491 (S.D.N.Y. 1989).

Even if the mall does not "go dark", however, the plaintiff will suffer injury that is irreparable because it is immeasurable. Customers will be lost; present tenants will lose sales, reducing rent in some cases, causing non-renewal or failure in others; prospective tenants will shy away. Proof of the damages attributable to the Ayres store's closing will be speculative. Any competent expert will be able to determine the loss to MassMutual between ADG's closing announcement and the time of trial. Given the downturn already evident at Scottsdale before the announcement, however, the court is unpersuaded that any expert will be able to identify, with any degree of certainty, the portion of the loss attributable to the Ayres closing, as distinct from loss attributable to other economic and marketing factors. Further, unless trial is deferred for twelve years or the mall "goes dark" in the near future, any trial expert would face the further task of predicting the mall's future performance and isolating the specific impact of the Ayres closing that future performance. The court is not persuaded that such testimony can be provided within the confines of the Federal Rules of Evidence.

Accordingly, the court concludes that while MassMutual's damages will be exclusively economic and that MassMutual has not made a sufficient showing that the mall will close altogether, MassMutual's probable injury is irreparable, within the meaning of the Seventh Circuit case law, due to the extreme difficulty of establishing both causation and amount of damages. Other courts have so held in similar circumstances. In *New Park Forest Associates II v. Rogers Enterprises, Inc.*, 195 Ill. App.3d 757, 142 Ill.Dec. 474, 552 N.E.2d 1215 (1990), the court found a sufficient allegation of irreparable harm in the closing of a mall tenant because each mall tenant contributes uniquely to the mall's "total tenant mix" and operates to attract customer traffic to the common area. In *Lincoln Tower Corp. v. Richter's Jewelry Co., Inc.*, 152 Fla. 542, 12 So.2d 452 (1943), the court found that because the interests of the landlord and tenants were inextricably bound together, it would be impractical, if not impossible, to establish the landlord's damages. *See also Madison Plaza, Inc. v. Shapira Corp.*, 387 N.E.2d 483 (Ind.App. 1979) (trial court found such irreparable injury); *Grossman v. Wegman's Food Markets, Inc.*, 43 A.D.2d 813, 350 N.Y.S.2d 484 (1973) ("There is also evidence, however, that a food store will draw people to a shopping center who will also patronize the other stores and that while the food shop is closed the business of the other stores will be diminished. There might well be damage to the other tenants while the food store remains vacant, and, if the vacancy extends over a long period of time, it is possible that a tenant might also vacate its premises with resulting damage to plaintiffs.").

Although it might be easier to attract a replacement anchor if the Ayres store continues to operate, a preliminary injunction would not spare the mall all of this injury. MassMutual's expert conceded that tenant uncertainty will remain even if the Ayres store is ordered to remain open temporarily, and MassMutual's planned redevelopment of Scottsdale will remain temporarily on hold. Thus, MassMutual may continue to suffer losses even during the life of the preliminary injunction it seeks. Nonetheless, while permanency would lessen the injury, MassMutual will suffer immeasurable damages without the preliminary injunction.

### B.

To be entitled to injunctive relief, Mass-Mutual also must show that the irreparable harm it will suffer in the absence of a preliminary injunction is greater than the irreparable harm ADG would suffer as a result of the requested preliminary relief. *Brunswick Corp. v. Jones*, 784 F.2d 271, 273–274 (7th Cir.1986). Evidence produced at the hearing clearly establishes that a

court-ordered reopening of the Scottsdale store would cost ADG considerable money.

### 1.

■ Reopening the Scottsdale Ayres store will require expenditures of approximately $2.75 million in direct and immediate start-up costs. Obtaining new merchandise, fixtures, and employees to put the store in the condition that existed before the closing was announced will take anywhere from two to six months. The store will have no merchandise, aside from any remaining "distressed" merchandise, to sell for a period of six to eight weeks. It will take additional weeks or months to restock and reestablish the Ayres store as a full line department store. Fixtures and visual fixtures will have to be ordered. Leased operations—departments ADG leases to others rather than operating itself, such as a beauty salon, men's shoes, Ticketmaster, and fine jewelry—would have to be reestablished. ADG has ordered no new inventory for the Scottsdale store. If a preliminary injunction is issued, the Scottsdale Ayres store must be virtually recreated from scratch.

Low inventory levels customarily maintained at other stores and the lack of sufficiently detailed store inventory records would preclude the use of other stores' inventory for a more rapid restoration of inventory at the Scottsdale store. ADG offered early retirement benefits to its employees under the consolidation plan; only four Scottsdale employees agreed to early retirement, but employees at other stores have taken early retirement, allowing ADG to place Scottsdale employees at those stores. Accordingly, even if former Scottsdale salespeople return to operate a reopened Ayres store at Scottsdale, ADG will have to hire additional employees elsewhere.

Further, the larger consolidation plans involving May's Famous–Barr stores have proceeded upon the assumption that the Scottsdale store would be closed. Accordingly, no arrangements have been made for merchandise buyers to stock a Scottsdale store; as of February 1, the responsibility for buying inventory will be transferred from ADG's old Indianapolis Ayres headquarters to St. Louis, and the great majority of the buyers in St. Louis are unfamiliar with the Scottsdale store's history and market. Presently, no buying for the Scottsdale store is occurring; ADG presently is buying merchandise for delivery to other stores in May or June. ADG's Ayres distribution system also is being transferred from Indianapolis to St. Louis, where no arrangements have been made for distribution to Scottsdale. Buying and distribution arrangements have been made in St. Louis for the University Park store.

Thus, a court-ordered reopening of the Scottsdale Ayres store would cost ADG approximately $2.75 million. That would not, of course, be the sole cost of reopening, because ADG would continue to incur the expenses associated with the operation of a 110,000 square foot department store; employees would have to be paid, health insurance provided, etc.

An operating Scottsdale store also would provide ADG with income, and many of the expenses set forth above would constitute the cost of doing business. While ADG would spend money on inventory, some or all of that inventory will be sold at a price higher than its cost. While new fixtures would have to be purchased, ADG would use those fixtures in its business; many of the old fixtures are in use in other stores. Accordingly, although these expenditures are outlays ADG would not have to make in the absence of the requested preliminary injunction, many of the expenditures will prove to be revenue-producing to some extent.

Further, many of the expenditures will have tax benefits to ADG; in light of the tax and depreciation benefits, ADG would recoup the entire start-up cost if the store made a profit of $340,000. In 1990, the store showed a $320,000 profit. Even assuming sharply reduced gross sales in light of the two to six months needed to reopen, it appears likely that ADG would recoup the start-up costs in two to three years.

### 2.

If preliminary injunctive relief is granted and ADG ultimately prevails at the trial on

the merits, the damage to ADG resulting from the preliminary injunction will be easily measurable. Apart from continuing rental obligations under the lease, all of ADG's expenditures for the Scottsdale store will have resulted from the court-ordered reopening. If ADG loses money, no future fact-finder will have to divine whether it did so because of Scottsdale's poor recent history, or because of Scottsdale's poor competitive position in comparison to University Park, or because of the overall economy, or because of the mall owner's poor performance in attracting tenants. ADG would not have been exposed to any of those concerns but for the preliminary injunction.

A court balances the irreparable harm to the respective parties on a preliminary injunction motion. As ADG noted in arguing that MassMutual had not shown irreparable harm, purely economic loss ordinarily is not irreparable; an award of damages can make the party whole. The same argument applies with peculiar force to a defendant's claim of irreparable harm from the issuance of the injunction:

> A harm so purely pecuniary—so readily quantifiable—from the grant of a preliminary injunction could in any event be prevented by requiring the plaintiff to post an injunction bond or equivalent security in accordance with Rule 65(c) of the Federal Rules of Civil Procedure, which makes such security mandatory....

*Cronin v. U.S. Department of Agriculture,* 919 F.2d 439, 445 (7th Cir.1990); *see also Ohio Oil Co. v. Conway,* 279 U.S. 813, 815, 49 S.Ct. 256, 257, 73 L.Ed. 972 (1929).

Accordingly, in balancing the harm MassMutual would suffer absent injunctive relief and the harm ADG would suffer through injunctive relief, MassMutual's immeasurable injuries are not to be weighed against ADG's easily quantifiable monetary injuries. *Artist M. v. Johnson,* 917 F.2d 980, 991 (7th Cir.1990), *cert. granted sub nom. Suter v. Artist M.,* ——— U.S. ———, 111 S.Ct. 2008, 114 L.Ed.2d 97 (1991). ADG has shown that a preliminary injunction would require it to make expenditures

totalling millions of dollars, expenditures that it otherwise would not make. That showing, however, does not affect whether the injunction should issue. Under the law of this circuit, it affects only the amount of the bond to be required as a precondition for the injunction.

3.

ADG also contends that it would suffer nonmonetary damage to its reputation if it should be forced to reopen. The court is unpersuaded. ADG already has damaged the Ayres reputation by declaring its intention to walk out on the Scottsdale Mall. The court does not believe that reopening the Scottsdale store will cause any greater damage to ADG's reputation with its Ayres customers.

4.

MassMutual has shown that it will suffer substantial and irreparable injury in the absence of a preliminary injunction. ADG will suffer no injury that cannot be readily quantified and insured against by an appropriate bond. Accordingly, the balance of harms weighs heavily in MassMutual's favor.

C.

To be entitled to a preliminary injunction, MassMutual also must demonstrate a reasonable likelihood of success on the merits. *Kinney v. Pioneer Press,* 881 F.2d 485, 491 (7th Cir.1989); *Glen Theatre, Inc. v. Civil City of South Bend,* 726 F.Supp. 728, 730 (N.D.Ind.1985). If no likelihood of success on the merits is shown, the preliminary injunction should be denied. *Kellas v. Lane,* 923 F.2d 492 (7th Cir.1991); *Somerset House, Inc. v. Turnock,* 900 F.2d at 1015. A plaintiff need not, however, depending upon the severity of the harm it will suffer if the injunction does not issue, demonstrate a high probability of success on the merits of its claim; it may suffice that the plaintiff's chances are better than negligible. *Ping v. National Education Ass'n,* 870 F.2d 1369, 1371 (7th Cir.1989). The more heavily the balance of harm weighs in the plaintiff's favor, the lower the degree of likelihood of success on the

merits that is required of the plaintiff. *Thornton v. Barnes*, 890 F.2d 1380, 1384 (7th Cir.1989). As noted in the previous section, the balance of irreparable harms weighs heavily in MassMutual's favor. MassMutual has demonstrated a realistic likelihood of success on the merits.

ADG makes several challenges to the sufficiency of MassMutual's showing on this element. ADG contends that the lease creates no obligation to continue the store's operation. It also argues that MassMutual cannot prevail on the merits of its claim for permanent injunctive relief because of the traditional reluctance of courts of equity to order specific performance of commercial contracts or to enter orders requiring long-term judicial supervision.[22]

### 1.

In 1971, the parties' predecessors entered into a 30–year contract. MassMutual contends, and Ayres denies, that the lease requires ADG to continue to operate its Ayres store at Scottsdale. In § 6.01 of the lease, ADG's predecessor agreed to use the building during the lease's continuance for the purpose of operating a merchandising business of the type it generally operates, and to do so in a high class manner.[23] In § 6.02 of the lease, ADG's predecessor agreed to be open for business when Wards and most other mall tenants are open, and to conduct its business with an eye toward the mall's unified and compatible operation.[24] In § 6.04 of lease, ADG's predecessor agreed to spend at least 2% of its annual gross sales on advertising, making specific reference to the Scottsdale store, and agreed to advertise concerning shopping center events sponsored by the merchants' association or some comparable entity.[25] Section 18.01 of the lease requires ADG to join, and remain in good standing in, the merchants' association.[26]

**22.** ADG also argued that MassMutual had not given it a notice of default, as said to be required by § 17.01 of the lease. Mr. Vaughan conceded at the TRO hearing that § 17.01 does not require notice of default in all instances, and that no notice is required if the tenant abandons the building.

**23.** *Section 6.01. Use By Lessee.* The Ayres Building, during the continuance of this Lease, shall be used and occupied by Lessee for the purpose of operating a merchandising business, selling at retail all kinds of merchandise and services and of the type from time to time generally operated by tenant or a business successor of tenant and for no other purpose or purposes without the written consent of landlord. Tenant shall operate and conduct its business in the Ayres Building at all times in a high class and reputable manner.

**24.** *Section 6.02. Conditions of Use.* Tenant shall be open for business during the hours and on the days when Wards and a majority of other tenants in the Shopping Center are open and shall conduct such business in good faith toward the end that the Shopping Center shall be a unified and compatible operation.

Tenant shall promptly comply with all laws, ordinances and lawful orders and regulations affecting the Ayres Building and the cleanliness, safety, occupation and use of same. No auction, fire or bankruptcy sales may be conducted in the Ayres Building without the previous written consent of the Landlord. Tenant shall not operate its business as a Discount Store. Tenant shall not use the Common Area or Mall for its own business pur-

poses without the written consent of Landlord.

**25.** *Section 6.04. Advertising.* Tenant agrees to expend, including its share of the group area advertising, during each lease year during the Term hereof a minimum amount equal to two percent (2%) of Tenant's annual gross sales during such lease year from the Ayres Building for the purpose of advertising the business being conducted by Tenant in the South Bend area making specific reference to the Ayres' Building, but if it so elects, also referring to other locations.... Tenant agrees to advertise in the media pertaining to events sponsored by the Merchants Association composed of tenants within the Shopping Center of which the Ayres Building is a part, or if there is no Merchants Association, by whomsoever is delegated by Landlord to sponsor such events (hereinafter referred to as "Shopping Center Events").

**26.** *Section 18.01. Membership in Merchants Association.* Tenant will become a member of, participate fully in, and remain in good standing in a Merchants Association (as soon as the same has been formed) to foster the interests of the tenants of the Shopping Center and adjoining properties, and will abide by the regulations of such association.... The objectives of such association shall be to encourage its members to deal fairly and courteously with their customers, to sell their merchandise or services at fair prices, to follow ethical business practices, to assist the business of the tenants by sales promotions and center-wide advertising, and in particular to help the interests of members of the said association.

In § 6.08 of the lease, MassMutual's predecessor gave ADG the right of approval of any tenant who sought to lease more than 20,000 square feet, and agreed not to allow such a tenant (other than Ayr–Way, now Target) to operate a general merchandise discount store.[27]

In § 12.01 of the lease, ADG's predecessor agreed not to sublet its store or assign the lease without the landlord's permission, except to a business successor.[28] Section 17.01 of the lease provides that a default shall be deemed to have occurred if ADG should abandon the building.[29]

As noted above, Indiana law governs the substantive issues presented by the parties. Under Indiana law, a court must attempt to interpret a contract so as to give effect to the intent of the parties at the time they form the contract. The parties' intentions are to be determined from the contract's four corners. *Estate of Saemann v. Tucker Realty*, 529 N.E.2d 126, 129 (Ind.App.1988). If the parties' intentions can be ascertained clearly by the contract language, Indiana courts recognize and enforce that agreement. *Myers v. Myers*, 560 N.E.2d 39, 43 (Ind.1990). The court must accept an interpretation that harmonizes the contract's provisions, as opposed to one which causes conflict between provisions. *First Federal Savings Bank of Indiana v. Key Markets, Inc.*, 559 N.E.2d 600, 603 (Ind.1990).

Indiana recognizes the existence of express or implied lease covenants requiring a tenant to operate a store continuously and actively. An implied covenant may be found if (1) the obligation arises from the parties' presumed intention as gathered from the contract's language, or appears, from the contract as a whole, to be indispensable to give effect to the parties' intent; and (2) it is so clearly within the parties' contemplation that they deem it unnecessary to express it. *Casa D'Angelo, Inc. v. A & R Realty*, 553 N.E.2d 515, 521 (Ind.App.1990).

Mr. Vaughan of ADG testified that the lease lacks the "magic words" necessary to create an obligation of continuous use of the premises; he testified that a reading of the entire lease allows one to glean ADG's right to terminate its occupancy after the lease's first five months of operation. Other Scottsdale tenants' leases, including the lease of Lerner Shops,[30] expressly require the tenants to operate stores continuously; the Ayres lease contains no such express language. ADG contends that §§ 6.01 and 6.02 are simply "purpose and use" clauses that only identify and limit the uses to which ADG may put the premises, and are not "continuous use" clauses. ADG argues that those provisions merely prohibit ADG from using the property for any other purpose, and do not require ADG to use the property for

27. *Section 6.08. Competition and Restrictions on Landlord.* Any other store in the Shopping Center in excess of 20,000 square feet of floor area shall only be leased for purposes and to tenants approved by Tenant. No space in excess of 20,000 square feet shall be leased to or operated as a general merchandise discount store ... except for the Ayr–Way store [now Target] ...

28. *Section 12.01. By Tenant.* Tenant shall not sublet said premises or any part thereof, but Tenant may, without Landlord's consent, grant licenses to concessionaires or sublease space in the Ayres Building for the operation of leased departments as part of Tenant's overall operation. Tenant may not assign this Lease without the prior written consent of landlord except to a Business Affiliate of Tenant or to a Business Successor of Tenant which assumes this Lease.

29. *Section 17.01. Events of Default....* [I]f Tenant shall abandon the Ayres Building ... then an event of default shall be deemed to have occurred.

30. **8. OPERATION OF BUSINESS**
**(a) Open for Business.** TENANT agrees to occupy the Premises and open its store for business fully fixtured, stocked and staffed, upon the Commencement Date of the term of this lease, and thereafter to continuously conduct in one hundred per cent (100%) of the space within the Premises under the name and for the business permitted hereunder.... This covenant by TENANT is a material consideration to LANDLORD hereunder in order that TENANT might produce the maximum gross sales possible from the Premises during the lease term, and maintain a continuous operation of a full service regional retail development.

the identified purposes for the entire lease term.

ADG argues that in *Casa D'Angelo, Inc. v. A & R Realty Company*, 553 N.E.2d 515, the Indiana Court of Appeals found that language similar to that of §§ 6.01 and 6.02 did not require continuous use of commercial premises. ADG is correct, but only to a point. In *Casa D'Angelo*, the court held that the trial court should have granted summary judgment to the tenant on the landlord's claim for damages arising from the breach of an alleged "continuous use" provision. As ADG argues, the language at issue in *Casa D'Angelo* was similar to that found in the lease at issue here, but it was not identical:

> *Use.* Lessee shall use the premises for the operation of a restaurant facility and for no other purposes without first obtaining the written consent of Lessor thereof.
>
> \* \* \* \* \* \*
>
> *Business Hours.* Lessee shall keep the leased premises open for business during normal business hours for a restaurant.

553 N.E.2d at 520. The court of appeals agreed with the tenant that the provisions merely restricted the tenant's use of the property and did not affirmatively require it to operate a restaurant. The *Casa D'Angelo* clause did not contain the language, "during the continuance of this Lease", found in § 6.01 of the Ayres–Scottsdale lease.

Resort to cases from other jurisdictions is not helpful on this issue. The Ayres–Scottsdale lease does not contain anything as explicit as the clause at issue in *New Park Forest Associates II v. Rogers Enterprises, Inc.*, 195 Ill.App.3d 757, 142 Ill.Dec. 474, 552 N.E.2d 1215 (1990) ("Tenant shall not vacate or abandon the Premises at any time during the Term"), but §§ 6.01 and 6.02 are more explicit than the clause found to require continuous use in *Ingannamorte v. Kings Super Markets, Inc.*, 55 N.J. 223, 260 A.2d 841, 40 A.L.R.3d 962 (1970) ("to be used and occupied only for a supermarket for the sale of all kinds of foods, groceries, vegetables and refreshments, expressly excluding the sale of drugs, cosmetics, hardware, stationery, dishes, and on the premises bakery").

More importantly, the *Casa D'Angelo* court declined to decide whether the "business hours" provision of the lease established an obligation of continuous use. The landlord sought damages, and could establish damages only if the lease contained an implied covenant to generate percentage rent. The court specifically noted that the landlord did not rely on the restaurant's operation to enhance the operation and value of its surrounding property; the landlord had only one other tenant, a fabric store that competed for limited parking spaces. 553 N.E.2d at 522. Thus, *Casa D'Angelo* differs from this case, both because the court looked for an implied covenant to generate percentage rent rather than a covenant of continuous use, and because the facts upon which the decision was based differed markedly from the circumstances surrounding one of three anchor stores of a large shopping mall.

Nonetheless, the *Casa D'Angelo* court's analysis provides considerable guidance. In determining the tests by which the case would be judged, the court wrote,

> Generally, courts in other jurisdictions have refused to find an implied covenant to generate percentage rent or to continuously operate, when the agreed base rent is substantial.... Conversely, when the base rent is insubstantial, the court have found such implied covenants.... Although substantial rent has been defined as more than nominal rent—"the modern day equivalent of a peppercorn"[,] the current trend is to define substantial rent as a fair market value for the premises. However, the burden of showing that the agreed base rent is not a fair rental value is upon the lessor....

Finally, a few courts have found an implied covenant to generate percentage rent or to continue operation, even when the base rent is insubstantial, where the provisions of the lease and the surrounding circumstances at the time of its execution show that the parties intended the payment of continuous rent or the contin-

uous operation of the tenant's business to have been a substantial consideration for the lease.

553 N.E.2d at 521.

ADG's rent is insubstantial in 1992. ADG pays a monthly rent of $21,170, or $254,000 per year, for its 107,900 square foot store, about $2.32 per square foot. That rental payment has remained unchanged since occupancy began in 1973 and will continue unchanged until 2004. Perhaps due to lack of discovery, no evidence was introduced concerning the present fair rental value of other stores in Scottsdale or of stores of comparable size at other shopping malls. Nonetheless, the uncontradicted testimony of Scottsdale Mall property manager Jeffrey Taylor indicates that ADG's rental obligation is well below market value.

More importantly, the lease provisions and the surrounding circumstances at the time of the lease's execution support the proposition that the parties contemplated continued use of the Ayres building. The developer personally negotiated the lease with ADG's predecessor. The lease allowed ADG's predecessor to direct the construction of its building to its specifications, provided ADG's predecessor with a limited veto right over other mall tenants, and rendered its rental payments inflation-proof into the twenty-first century. On the basis of the record before the court, the proposition that the mall developers and financiers would construct a 109,700 square foot building to Ayres' specifications, as part of a 658,000 square foot shopping mall, with the understanding that Ayres could abandon the mall any time after five months had elapsed, is preposterous.

ADG argues that courts do not imply a covenant of continuous use in the absence of an agreement to pay percentage rent. The quoted language from *Casa D'Angelo* strongly suggest that Indiana law recognizes no such rule. Further, the anchor's role in a shopping mall serves a function similar to an obligation to pay percentage rent. Although the anchor itself may have no such obligation, its operation populates the mall with shops and shoppers, producing additional income to the landlord. Should the anchor cease doing business at the mall, the effect to the landlord is the same: no payments are received in excess of the base rent, whether because the anchor tenant has no income on which a percentage rent provision could apply, or because the mall's income wanes with the other shops and shoppers due to the anchor's absence.

Mr. Vaughan opined at the hearing that "nobody in their right minds" would agree to be bound to operate for thirty years. The parties plainly agreed to something, however, and the surrounding circumstances strongly suggest that it was thirty years of continuous use.

MassMutual has satisfied its burden of demonstrating a reasonable likelihood of success in ultimately establishing that ADG is subject to an implied covenant of continuous operation for the duration of the lease.

2.

ADG argues that equity's traditional reluctance to grant specific performance of contracts and to undertake judicial supervision for lengthy periods of time make it unlikely that MassMutual will succeed on the merits of its complaint for a permanent injunction.

At the hearing, ADG analogized its lease to a contract for personal services. Indiana recognizes a general rule against preliminary injunctions to require enforcement of a contract for personal services. *See, e.g., State ex rel. Cleary v. Board of School Commissioners of City of Indianapolis,* 438 N.E.2d 12, 14 (Ind.App. 1982). This is a dubious analogy when the party to be compelled is a corporation; notions of indentured servitude become inapplicable. Even so, the rule with respect to contracts for personal services is not an absolute prohibition; trial courts have discretion to balance that general rule in determining whether a preliminary injunction is appropriate. *Board of Trustees v. Benetti,* 492 N.E.2d 1098, 1104 (Ind.App.1986). The general rule commonly yields to equitable principles, for example, in personal

service contracts and franchise agreements that include covenants not to compete. *See, e.g., Hacienda Mexican Restaurant of Kalamazoo Corp. v. Hacienda Franchise Group, Inc.*, 569 N.E.2d 661 (Ind.App. 1991); *Unishops, Inc. v. May's Family Centers, Inc.*, 399 N.E.2d 760 (Ind.App. 1980).

■ Instead, the proper inquiry is whether suit for monetary relief can provide adequate relief. *See, e.g., Unishops v. May's Family Centers*, 399 N.E.2d at 765; *Welcome Wagon v. Haschert*, 125 Ind.App. 503, 508, 127 N.E.2d 103, 106 (1955). This is a logical approach. Were it otherwise, indeterminate economic damage never could form the basis for injunctive relief.[31] Courts never would enjoin actual or anticipatory breaches of covenants not to compete, nor enjoin upstream riparian owners from continuing to pollute a river to the detriment of downstream owners. *See Weston Paper Co. v. Pope*, 155 Ind. 394, 57 N.E. 719 (1900) (enjoining pollution).

■ Indiana has not gone so far, and has recognized instead that injunctive relief is appropriate if it is more practicable, efficient, or adequate than relief afforded by law. *Porter Memorial Hospital v. Malak*, 484 N.E.2d 54, 62 (Ind.App.1985). Monetary relief may be impracticable, inefficient, or inadequate for a number of reasons: the damages may be speculative in amount; disputes over causation may render the fact of injury unclear; the amount of damages may be potentially excessive; the injury may continue over so great a period of time that multiple damages suits would be needed. Indiana law requires that the remedy at law be "as plain, complete and adequate—or, in other words, as

practical and efficient to the ends of justice and its prompt administration—as the remedy in equity." *McKain v. Rigsby*, 250 Ind. 438, 444, 237 N.E.2d 99, 103 (1968). As discussed above, the uncertainty of proof concerning damages renders a suit for monetary damages an inadequate remedy for MassMutual.

ADG's stronger argument relies upon the reluctance of courts of equity to enter injunctions that will require long-time judicial supervision. Trial courts must tend to the needs of all litigants; a discretionary act that will distract a court from other cases for many years should not be taken lightly. Many other courts have relied upon this rule of discretion in declining to enter injunctions against departing commercial tenants.

In *8600 Associates v. Wearguard Corp.*, 737 F.Supp. 44 (E.D.Mich.1990), the court denied injunctive relief on this ground, notwithstanding that the lease specifically consented to injunctive relief. The court stated that cases denying injunctive relief reflect the modern trend and the majority rule.[32] In *New Park Forest Associates II v. Rogers Enterprises, Inc.*, 195 Ill.App.3d 757, 142 Ill.Dec. 474, 552 N.E.2d 1215 (1990), the court assumed that the plaintiff had pleaded irreparable harm from the alleged breach of a clear covenant of continuous use, and further assumed that the balance of harms favored the plaintiff, but denied a preliminary injunction because of Illinois law's concern over long-term supervision. In *Grossman v. Wegman's Food Markets, Inc.*, 43 A.D.2d 813, 350 N.Y.S.2d 484 (1973), the court conceded the possibility of damage to the mall and other tenants due to loss of customer traffic, but denied injunctive relief based on New York's re-

---

**31.** In its brief in opposition to the preliminary injunction, ADG cites *Canada Dry Corp. v. Nehi Beverage Co., Inc.*, 723 F.2d 512, 526 (7th Cir. 1983), for the proposition that the concept of efficient breach of contract allows a party to "refuse to fulfill its obligations and be liable only for the damages which the other party suffers as a result of the breach." While this may be true in assessing a claim for punitive damages—which the *Canada Dry* court considered—it is of little assistance to a court in equity determining whether to order specific

performance of a contract when a damage award would be an inadequate remedy.

**32.** By way of contrast, the court in *Dover Shopping Center, Inc. v. Cushman's Sons, Inc.*, 63 N.J.Super. 384, 164 A.2d 785 (1960), concluded that although equity ordinarily will not order specific performance over a long period of time, the modern tendency is to grant specific performance where the breach is clear, and difficulties of enforcement are not great, particularly when compared with inadequacy of damages at law.

luctance to grant specific performance when such an order would require long-term judicial supervision.

■ *Madison Plaza, Inc. v. Shapira Corp.*, 387 N.E.2d 483 (Ind.App.1979), provides a clear lesson on this general equitable principle's operation under Indiana law. A shopping center sought to enjoin the closing of a retail store that occupied 20% of the center's leasable space. The trial court found irreparable harm of the sort demonstrated by MassMutual in this case, but denied the requested injunction, in part because "A decree of specific performance would require the Court to maintain constant supervision over a long period of time of acts involving taste, skill, judgment and technical knowledge in order to enforce the decree." 387 N.E.2d at 486. The court of appeals affirmed the injunction's denial, but made clear that the principle upon which the trial court relied is one of discretion, not an absolute bar to injunctive relief:

> In the case at bar we must search for an abuse of discretion in denying an injunction. An abuse of judicial discretion '... is an erroneous conclusion and judgment, one clearly against the logic and effect of the facts before the court or against the reasonable, probable and actual deductions to be drawn therefrom.' ... Although Judge Sullivan made the following statement ... in the context of reviewing a default judgment, the statement is appropriate also in the case at bar:
>
> > ... the fact that another trial court might not have abused its discretion by granting ... relief on these facts, does not necessarily mean that the court below abused its discretion by denying relief.
>
> Due to the lengthy period of time involved, the nature and size of Shapira's business operation, and the detailed nature of the relief sought by Madison Plaza in its complaint, we cannot say that the Jefferson Circuit Court's judgment is clearly against the logic and effect of the facts before the court. We hold that the trial court did not abuse its discretion

when it denied the equitable relief sought by Madison Plaza.

387 N.E.2d at 487. Accordingly, while Indiana law requires a trial court to weigh the burden of long-term supervision as a factor affecting the grant of injunctive relief, the weighing itself is a matter within the trial court's discretion.

In *Dover Shopping Center, Inc. v. Cushman's Sons, Inc.*, 63 N.J.Super. 384, 164 A.2d 785 (1960), the plaintiff eliminated the equitable concern altogether by waiving judicial supervision, relying on the defendant's self-interest as assurance of proper performance. MassMutual presents a variant on this position. Without waiving the option of judicial proceedings to enforce the lease's provisions, MassMutual argues that ADG's self-interest in maintaining its image among Ayres customers would reduce the likelihood of a need for judicial supervision. ADG maintains several other Ayres stores in Indiana, including one in this market. Ayres has earned an enviable reputation among Indiana shoppers, and it is unlikely that ADG would jeopardize that image by operating a store below the standards required by the lease.

ADG points to many areas of potential dispute over the lease provisions. For example, the lease requires the Ayres store to stock all types of merchandise; ADG inquires whether that provision requires it to carry "better" merchandise as it does in other stores, or whether it would be allowed to stock only Notre Dame sweatshirts without also stocking Indiana University sweatshirts. ADG also points to possible disputes over building maintenance (whose responsibility is it to repair roofs, or to handle water damage?), merchant association activities (how are promotions organized if only half the storefronts are open?), and restrictions on free-standing kiosks (is a Christmas display a kiosk?).

ADG's identification of potential topics for judicial resolution is imaginative, but the court does not believe it likely that such issues will find their way into the courtroom. The lease provisions have had the opportunity to produce dispute and litiga-

tion for the eighteen years in which ADG and its predecessor have operated its Scottsdale store, but ADG cited no examples of prior disputes about the Scottsdale store having produced litigation. Imposition of a temporary injunction may change the situation: MassMutual will be armed with the option of seeking an order in contempt, an option not wielded by predecessor landlords; ADG may think it in its interest to raise such disputes during the pendency of a temporary injunction, to strengthen its argument on this ground against a permanent injunction. Nonetheless, the history of the Scottsdale store presents little reason to believe the court will be distracted from its work on a frequent basis over the years remaining on the lease.

MassMutual has made a sufficient showing that it has a reasonable chance of success on the merits, notwithstanding the equitable doctrine concerning long-term supervision. Again, MassMutual need not establish its right to prevail; in light of the heavy balance of irreparable harm in its favor, it need only show that its chances are more than negligible. It has done more than that.

### D.

Finally, MassMutual must demonstrate that the injunction will not harm the public interest. Each side invokes the public interest in its support.

MassMutual presented the testimony of the South Bend city councilman who represents the councilmanic district in which the Scottsdale Mall is located. He reported that his constituents, like he, prefer the convenience of a nearby mall containing an Ayres store. Although University Park is but a few miles away, vehicular and train traffic make the drive much longer than the citizenry would like. Further, the Ayres closing poses substantial risk to the continued operation of other specialty shops at Scottsdale; that risk, in turn, threatens the jobs those shops presently provide. Maintaining an operating Ayres store improves the likelihood of Scottsdale's eventual success, even if only

through the improved chances of replacing the Ayres store with another anchor store.

ADG notes that the Scottsdale store's closing will not deprive South Bend shoppers of an Ayres store. Further, court-ordered operation of the store may disserve the efficient operation of a business, and certainly will perpetuate a partnership of unwilling partners.

The balance of public interests cannot be weighed with certainty, but the court need not do so for purposes of deciding the preliminary injunction motion. The court need only determine whether the preliminary injunction would harm the public interest. On balance, the harm to the public interest is at least offset by the benefits to the public interest.

### E.

MassMutual has met its burden of satisfying each of the four factors required for issuance of an injunction. Accordingly, whether injunctive relief should be granted rests within the court's discretion. *Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429 (7th Cir.1986).

### 1.

ADG argues that the preliminary injunction should be denied because it seeks more than maintenance of the "status quo" pending the case's final determination. MassMutual does not seek preservation of a store stocked with scattered "distressed" merchandise (the situation existing at the time of the hearing) or the preservation of a store in the process of closing (the situation existing at the time of the suit's filing). MassMutual seeks restoration of a condition—the regular operation of an Ayres store—that had ceased to exist by the time suit was filed.

ADG is correct that, under both Indiana and federal law, a preliminary injunction is intended to preserve the "status quo" until an opportunity can be had for final determination of the case. *F.T.C. v. Weyerhaeuser Co.*, 648 F.2d 739, 741 (7th Cir.1981); *State Board of Public Welfare v. Tioga Pines Living Center, Inc.*, 575

N.E.2d at 306. State and federal law also recognize, however, that the status quo need not consist of a photographic replication of the circumstances existing at the moment suit was filed. If the defendant has proceeded with a course of action known to be disputed, courts of equity may compel a defendant to correct injury already inflicted by defining the status quo as the last peaceable uncontested status that existed before the dispute arose. *Washington Capitols Basketball Club, Inc. v. Barry,* 419 F.2d 472, 476 (9th Cir. 1969); *Rees v. Panhandle Eastern Pipe Line Co.,* 176 Ind.App. 597, 605, 377 N.E.2d 640, 646 (1978); *Mounce v. Bostick,* 531 S.W.2d 887 (Tex.Civ.App.1976); *Steggles v. National Discount Corp.,* 326 Mich. 44, 39 N.W.2d 237, 240, 15 A.L.R.2d 208 (1949); *see generally* 11 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2948 (1973).

 ADG knew as early as November 25 of MassMutual's intent to contest the closure decision in court, yet proceeded with its plans for closing the Scottsdale store. The cost of retracing the steps toward closure certainly weigh on the discretionary determination of the motion for preliminary injunction, but the steps themselves constitute no prohibition against injunctive relief.

 ADG also suggests that MassMutual is guilty of laches, which should lead the court to deny the request for injunctive relief. Although the sixty-day delay between ADG's announcement and the filing of suit affect the cost of the injunction to ADG, the court does not agree that laches defeats the motion for preliminary injunction. The court cannot find that MassMutual unreasonably delayed filing suit. MassMutual first sought, through Dial, to work with ADG toward a solution that would include the Scottsdale Ayres store's continued operation. Perhaps through no fault of ADG's, but certainly without unreasonable delay by MassMutual, the first meeting could not be held until November 25, a month after the announcement. MassMutual then offered ADG thirty additional days before filing suit to allow a

solution to be found. The court does not mean to imply that ADG had a duty to negotiate the store's continued operation, but the court declines to hold unreasonable MassMutual's attempt to seek a solution before filing suit. A finding of laches on such facts would impel every disputant to immediate litigation, without first seeking amicable settlement, for fear of being accused of undue delay. The court does not understand such a result as being consistent with the efficient use of limited judicial resources.

Accordingly, the court does not find that the present circumstances at Scottsdale, or the reasons for those circumstances, preclude issuance, in the court's discretion of the preliminary injunction sought by MassMutual.

### 2.

 MassMutual has made the showings it must make to vest the court with discretion to issue a preliminary injunction, and ADG has failed in its efforts to demonstrate a bar to such relief. It remains to determine whether the court's discretion should be exercised in MassMutual's favor.

The question is not rhetorical. A preliminary injunction "is an exercise of very far-reaching power, never to be indulged in except in a case clearly demanding it." *Schwinn Bicycle Co. v. Ross Bicycles, Inc.,* 870 F.2d 1176, 1181 (7th Cir.1989). The court recognizes as well that mandatory preliminary injunctions compelling a party to take affirmative action "are cautiously viewed and sparingly issued." *Jordan v. Wolke,* 593 F.2d 772, 774 (7th Cir.1978). Further, no court ever has entered an injunction of the type sought in, and under the circumstances of, this case. Careful consideration is appropriate when a court is asked to do, in the exercise of discretion, what no other court has done. Recognition of the limited standard of review available on appeal heightens this obligation. *See National People's Action v. Village of Wilmette,* 914 F.2d 1008, 1011 (7th Cir. 1990); *Thornton v. Barnes,* 890 F.2d at 1385; *Gould v. Lambert Excavating, Inc.,* 870 F.2d 1214, 1217 (7th Cir.1989).

Injunctive relief was ordered and affirmed in *Lincoln Tower Corp. v. Richter's Jewelry Co., Inc.,* 152 Fla. 542, 12 So.2d 452 (1943), although the opinion leaves it unclear whether the tenant was enjoined to keep its store open during hours in which it wanted to close for want of sufficient help, or to keep the store from closing altogether. The tenant agreed that the lease's "business hours" provision was valid. The court found that the interests of the landlord and tenants were inextricably bound together and that it would be impractical, if not impossible, to establish the landlord's damages, so the landlord's remedy at law was inadequate. 152 Fla. at 544, 12 So.2d at 453. Again, however, it cannot be determined from the opinion whether the court ordered a business kept open in the face of the business owner's desire to close it.

Injunctive relief was also ordered and affirmed on appeal in *Dover Shopping Center, Inc. v. Cushman's Sons, Inc.,* 63 N.J.Super. 384, 164 A.2d 785 (1960). The trial court had ordered that the tenant reopen the store, maintain required hours, put up an outside sign, and have a manager or salesperson in charge. The landlord's remedy at law was deemed inadequate because of the difficulty in measuring damages from withdrawal of one member of a semi-cooperative enterprise like a shopping center. Two factors distinguish the *Dover Shopping Center* case from the Scottsdale case, however. First, the tenant had consented to injunctive relief in the lease: "In the event of a breach or threatened breach by Tenant of any of the covenants or provisions hereof, Landlord shall have the right of injunction". 63 N.J.Super. at 393, 164 A.2d at 790. Second, the court found that the balance of harms outweighed the traditional reluctance to engage in long-term supervision because the store required only one salesperson and the landlord waived supervision. The court noted that the "modern" tendency is to grant specific performance where breach is clear and difficulties of enforcement are not great, particularly when compared with inadequacy of damages at law. 63 N.J.Super. at 394, 164 A.2d at 791.

Here, as noted in previous sections, ADG did not specifically consent to injunctive relief, the Ayres store requires far more than a single salesperson, and MassMutual has not waived judicial supervision altogether.

The parties have not cited any other case in which injunctive relief was granted under any remotely similar circumstances. Injunctive relief has been denied in several reported cases, relying on a variety of grounds; as will be seen, each of those cases differ from the Scottsdale situation, as well.

In *CBL & Associates, Inc. v. McCrory Corp.,* 761 F.Supp. 807 (M.D.Ga.1991), the court denied a preliminary injunction on two grounds. First, the court noted the difficulty of long-term judicial oversight. Second, the court concluded that the plaintiff had not shown a likelihood of success on the merits. The store was not an anchor and occupied less than 2% of the mall's leasable square feet. Thus, the only possible loss to the landlord would consist of minimum rent; percentage rent was not likely to be lost from a store that had lost money in last two years. 761 F.Supp. at 808–809. Here, the court has found that MassMutual has established a likelihood of success on the merits of its claim that the loss of the anchor store will cause it immeasurable harm.

In *Center Development Venture v. Kinney Shoe Corp.,* 757 F.Supp. 34 (E.D.Wis. 1991), the court denied preliminary injunctive relief on four bases. First, the landlord had not demonstrated a likelihood of success on its claim that the lease included an implied covenant of continuous use. Second, the landlord's remedy at law was adequate, because the court rejected the argument that a non-anchor "vacancy in the mall results in an exponential decrease in business and mall attraction." 757 F.Supp. at 36. Third, the landlord had not shown that the tenant's departure would threaten the mall operation's existence. Finally, the court found that the tenant's shop was not so specialized as to be irreplaceable. This case involves an anchor rather than a specialty shop. The court

has found a substantial likelihood of implying a covenant of continuous use, MassMutual's damages are irreparable, and the closing of the Ayres departure would threaten the mall's operation. 757 F.Supp. at 36.

In *8600 Associates v. Wearguard Corp.,* 737 F.Supp. 44 (E.D.Mich.1990), the court denied injunctive relief on three bases, although the lease (like that in *Dover Shopping Center*) provided for injunctive relief. First, the court relied on the burden of continuous supervision, noting that cases denying injunctive relief reflected the modern trend and the majority rule. Second, the court concluded that the other tenants' loss of business was purely economic, so an adequate remedy at law existed. Third, the court expressed doubt that the defendant tenant, a non-anchor that occupied about 1% of the mall and had been losing business, constituted a "draw" to the shopping center. 737 F.Supp. at 46. In contrast, the court has found that the Ayres store is a "draw" to Scottsdale, and that the loss to the mall, while economic, cannot be measured for purposes of a damages award.

In *New Park Forest Associates II v. Rogers Enterprises, Inc.,* 195 Ill.App.3d 757, 142 Ill.Dec. 474, 552 N.E.2d 1215 (1990), injunctive relief was denied notwithstanding facts very favorable to the plaintiff-landlord. The lease expressly provided, "Tenant shall not vacate or abandon the Premises at any time during the Term." 195 Ill.App.3d at 759, 142 Ill.Dec. at 475, 552 N.E.2d at 1216. The court assumed that the landlord had pleaded irreparable harm because each mall tenant contributes uniquely to the tenant mix and operates to attract customer traffic to the common area, and further assumed that the balance of harms favored the landlord because the defendant-tenant was making money. 195 Ill.App.3d at 762, 142 Ill.Dec. at 477, 552 N.E.2d at 1218. Nonetheless, the court denied injunctive relief because of Illinois courts' strong stand against long term judicial supervision: "New Park Forest does not present a likelihood of success on the merits because Illinois courts will not specifically enforce a long term lease of this nature." 195 Ill.App.3d at 765, 142 Ill.Dec. at 479, 552 N.E.2d at 1220. As noted with respect to Indiana's *Madison Plaza* case in Part II–C–2 of this opinion, Indiana's rule concerning long term supervision appears to be more flexible.

In *Grossman v. Wegman's Food Markets, Inc.,* 43 A.D.2d 813, 350 N.Y.S.2d 484 (1973), the court affirmed the trial court's denial of injunctive relief. The appellate court conceded the possibility of damage to the mall and other tenants from the loss of customer traffic, but based its ruling on New York courts' reluctance to grant specific performance when such decrees would require long-term judicial supervision. The case appears to be effectively indistinguishable from *Madison Plaza;* as noted in Part II–C–2 of this opinion, language in the *Madison Plaza* opinion suggests that the granting of such an injunction would have lain within the trial court's discretion, as well.

Apart from Indiana's *Madison Plaza* case, the parties cited no other case addressing the propriety of injunctive relief to enforce a claimed continuous use provision in a commercial lease.[33]

If the remedy sought by the plaintiff is unprecedented, it may be because the de-

---

33. In *Bradlee's Tidewater, Inc. v. Walnut Hill Investment, Inc.,* 239 Va. 468, 391 S.E.2d 304 (1990), the court reversed the trial court's grant of injunctive relief, but did so because the continuous provision had lapsed, so the plaintiff-landlord could show no likelihood of success. Contrary to the statement in ADG's post-hearing brief, the court did not reject the plaintiff's "anchor tenant theory"; the plaintiff attempted to abandon the argument on appeal. 239 Va. at 474, 391 S.E.2d at 308.

The parties also cited other cases that involved a declaratory judgment action to determine whether a lease contained a continuous clause, *Fay's Drug Co., Inc. v. Geneva Plaza Associates,* 98 A.D.2d 978, 470 N.Y.S.2d 240 (1983), suit by a landlord to recover possession from a non-operating, rent paying tenant, *Ingannamorte v. Kings Super Markets, Inc.,* 55 N.J. 223, 260 A.2d 841, 40 A.L.R.3d 962 (1970), and suits for damages for breach of covenants of continuous use or similar provisions. *Casa D'Angelo, Inc. v. A & R Realty Co.,* 553 N.E.2d 515 (Ind. App.1990); *Columbia East Associates v. Bi–Lo, Inc.,* 299 S.C. 515, 386 S.E.2d 259 (1989).

None of these cases guide the court in the exercise of its discretion concerning preliminary injunctive relief.

fendant's conduct is unprecedented. At the hearing, ADG presented considerable instances of anchor stores departing shopping malls due to bankruptcy or other reasons, but cited no instance in which an anchor walked away with twelve years remaining on a lease,[34] simply because the store was insufficiently profitable and the store wanted to do business elsewhere. Perhaps such conduct is more commonplace than this record reflects, but if MassMutual's proposed decree is extraordinary only because the conduct it seeks to enjoin is extraordinary, placing a higher burden on MassMutual would be inappropriate.

Nonetheless, it is MassMutual that bears the burden of persuading the court to grant its request for a preliminary injunction. It seems that a party who seeks unprecedented relief should be required to make a stronger case for relief than a party who seeks a more familiar sort of decree.

Even by this higher standard, the court believes that MassMutual has demonstrated its entitlement to preliminary injunctive relief:

 a. MassMutual has demonstrated a likelihood of very significant irreparable harm: the closing of the Ayres store likely will reduce its mall, valued at $17.3 million less than a year ago, to two widely separated anchor stores, each surrounded by a small cluster of specialty shops (with one such cluster located on a single level), with an abyss of vacant space between them; the challenge of isolating ADG's actions from other economic factors as a cause of the mall's deterioration for purposes of a damages award will be insurmountable. Based on the record presently before the court, it appears that judicial economy will be threatened more greatly by an effort to determine such damages than by the specter of continuing, long term judicial supervision of the Ayres store.

 b. The risk of irreparable harm to ADG is not simply less than the risk to MassMutual; it is nonexistent. Any damage to ADG arising from an injunction later vacated will consist of easily quantified monetary loss. Rule 65(c) exists to protect against such risks of loss. Accordingly, the balance of irreparable harms is entirely one-sided.

 c. Given so uneven a balance of harms, MassMutual need only show a likelihood of success on the merits that is more than negligible. It has shown much more than that. It has shown, not merely that ADG is subject to what arguably are mere purposes and hours provisions, but also that the lease requires ADG to promote the Scottsdale store in its advertising, forbids ADG from subletting or assigning the lease without the landlord's provision, and allows ADG a veto over certain prospective tenants. MassMutual also has shown that surrounding circumstances exist that strongly suggest that the parties intended the building's continued use as an Ayres store.

Viewing the issue from the other perspective, the court cannot find that the injunction's issuance would be oppressive, harsh, or inequitable, or impose an undue hardship. An injunction would require ADG to do nothing more than it agreed to do when it accepted assignment of the lease: operate an Ayres store in the Scottsdale Mall. Whether ADG agreed to operate the store continuously until 2004 ultimately is a matter for resolution at trial, but it is beyond question that ADG agreed to operate the store for a time. This injunction would merely require it do what it agreed to do until trial.

Accordingly, even recognizing the singular nature of the relief MassMutual seeks, the court concludes that MassMutual has demonstrated its entitlement to it.

### F.

 Fed.R.Civ.P. 65(c) provides: "No ... preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been

---

**34.** In Indiana's *Madison Plaza* case, the defendant left with seven years remaining on the lease. 387 N.E.2d at 483–484.

wrongfully enjoined...." The posting of security is required for the issuance of any preliminary injunction.

■ As noted in Part II–B of this opinion, the injunction's issuance will require ADG to make start-up expenditures of about $2.75 million, although the store's eventual operation will defray some of those costs as inventory is sold at prices exceeding its costs, and tax and depreciation benefits to ADG will defray the expenditures further. The court does not believe, however, that the record warrants the inference argued by MassMutual that ADG will recoup the expenditures within a year. Given the time necessary to reestablish the store, it seems unlikely that the store will be doing business before late spring or early summer. MassMutual's own evidence indicates that once customers stop shopping at a mall, it is a difficult process to entice them to return; this supports an inference that sales will be slow upon the reopening.

In Part B of this opinion, the court stated its belief that, absent a decline in customer traffic at Scottsdale Mall, ADG should recoup its initial expenditure within two to three years. Nothing about this suit suggests that it should take that long to try. There appears to be no impediment to trial within nine to fifteen months from this date. Even if the start-up costs are viewed, as MassMutual suggests, as investment in the business of the Scottsdale Ayres store, ADG is unlikely to have recouped its investment by the time of trial.

Accordingly, the court believes that security in the sum of $1 million is necessary to protect ADG against damages that would be incurred if ADG later is found to have been wrongfully enjoined. If Mass-Mutual should believe that sum too high, or ADG believe it too low, the court will entertain a motion to substitute a bond in a different amount. Until such a determination, however, the preliminary injunction issued today shall become effective if, and only if, MassMutual posts a bond or other approved security in the sum of $1 million.

### III.

For the foregoing reasons, MassMutual's motion for preliminary injunction is grant-ed and, upon the plaintiff's posting of security in the sum of $1 million, the defendant is hereby ordered to:

(a) restock, refixture, and reopen an L.S. Ayres department store of the type operated by the defendant prior to October 25, 1991;

(b) comply with this order in good faith and make the reopening of the Scottsdale Mall L.S. Ayres store a top priority of defendant and reopen this store as soon as reasonably practicable;

(c) keep the plaintiff, other Scottsdale Mall tenants, and the general public informed of the defendant's progress towards reopening the Scottsdale Mall L.S. Ayres store on at least a bi-monthly basis utilizing local media and other available communications;

(d) continue to be open for business during the hours and on the days when Wards and a majority of other tenants in the shopping center are open once the L.S. Ayres store has reopened; and

(e) comply with the provisions of the Lease between the parties.

SO ORDERED.