**Edward W. ROTHE, Trustee of the Edward W. Rothe Employees Profit Sharing Trust, Plaintiff,**

v.

**REVCO D.S., INC., Defendant.**

**No. IP 96–1435–C–M/S.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Sept. 11, 1997.

---

Edward W. Rothe, Chicago, IL, for Plaintiff.

Terrence L. Brookie, Locke Reynolds Boyd & Weisell, Indianapolis, IN, for Defendant.

### ORDER

McKINNEY, District Judge.

Both Plaintiff, Edward W. Rothe, Trustee of the Edward W. Rothe Employees Profit Sharing Trust ("Rothe"), and Defendant, Revco D.S., Inc. ("Revco") have moved for summary judgment against the respective opposing party. At issue is whether Revco breached its lease contract with Rothe when it vacated the premises leased from him and discontinued its payment of gross sales percentage rent. The issues have been briefed by counsel and are ready to be resolved. Also pending is a motion by Revco to strike Rothe's affidavit, and three Motions in Limine challenging the relevance of certain evidentiary materials submitted by Plaintiff in support of summary judgment. For the reasons discussed below, the Court **GRANTS** Revco's motion for summary judgment and **DENIES** Rothe's motion for summary judgment. The other pending Revco motions are deemed moot in light of the Court's ruling on the summary judgment motions.

### I.  FACTUAL BACKGROUND

On March 24, 1958, Obed and Mary Ellis entered into a lease with Hook Drugs, Inc. ("Hooks"). Hooks leased an 8,125 square foot retail space at 358 W. Walnut, Frankfort, Indiana. The lease ran for fifteen years and provided for two five-year renewal options. Lease Art. III §§ 1 & 3(a). The parties stipulated to the fact that John Grayson of Ross, McCord, Ice & Miller, attorney for Hooks Drugs Inc., drafted the original lease for the premises, as well as subsequent modifications. Stipulations Aug. 29,1997. Key sections of the lease provided as follows:

*Rent.* Fixed and percentage Rent. Tenant agrees to pay to Landlord, at such place or places as the Landlord shall designate from time to time in writing, rent for the Demised Premises as follows: (a) A fixed annual minimum rent of Eleven Thousand Five Hundred Dollars ($11,500.00) payable in advance in equal successive monthly installments ... (b) In addition to the fixed minimum rent, Tenant shall pay percentage rent in an amount equal to Three percent (3%) of the gross sales in excess of Three Hundred Eighty Thousand Three Hundred Thirty-three Dollars and Thirty-three cents ($383,333.33) per year. Percentage rent for partial lease years shall be prorated. *Id.* Art. IV § 1(a-b).

\*    \*    \*    \*    \*    \*

*Gross Sales.* The term "gross sales" as used herein shall mean the total amount in dollars of the actual sales price, whether for cash or on credit, or partly for cash and partly on credit, of all sales of merchandise and services and all other receipts of business conducted in or from Demised Premises by the Tenant. *Id.* Art. V § 2.

\*    \*    \*    \*    \*    \*

*Annual Sales Reports.* On or before the sixtieth day after the expiration of each full year, Tenant shall deliver to the Landlord, at the place where rent is payable, a complete statement, duly certified by an officer of the Tenant, showing in reasonable detail the amount of gross sales made from the Demised Premises during said period. *Id.* Art. V § 4.

\*    \*    \*    \*    \*    \*

*Demised Premises.* The Landlord hereby leases to the Tenant and the Tenant hereby leases from the landlord, upon and subject to the terms and provisions of this lease, the store premises described in the attached Exhibit C, which is hereby made a part hereof, and which store premises will be referred to hereinafter as the "Demised Premises." *Id.* Art. I § 1.

\*    \*    \*    \*    \*    \*

*Business Use.* The Demised Premises may be used and occupied only for the operation of a drugstore and for no other purpose without the written consent of the Landlord. *Id.* Art. VIII § 1.

\*    \*    \*    \*    \*    \*

*Limitations.* The Demised Premises shall be used only for retail business and retail

commercial purposes, and no industrial, manufacturing or processing activities ... shall be conducted in the Demised Premises. *Id.* § 4

\*     \*     \*     \*     \*     \*

*Tenant May Not Assign or Sublet.* Tenant shall not assign or in any manner transfer this lease or any interest therein, or sublet the Demised Premises or any part or parts thereof, or permit occupancy by anyone with, through or under it, without the previous consent of Landlord. *Id.* Art. XV § 1.

\*     \*     \*     \*     \*     \*

*Business Successor.* Notwithstanding the provisions of Section 1 of this Article [requiring written consent], Tenant may assign or transfer this lease, without the consent of the Landlord, to another corporation which shall acquire or succeed to all or substantially all of the business and goodwill of Tenant.... *Id.* § 3.

\*     \*     \*     \*     \*     \*

*Exclusive Use.* Tenant shall have the exclusive right to operate a drugstore in the Shopping Area. Landlord will not lease, rent, or permit to be occupied by any business similar in nature to that to be carried on by Tenant.... *Id.* Art. VIII § 2.

The Lease set out procedures to follow if the Landlord broke the covenant of exclusive use, but no consequences were described in the event the Tenant ceased using and occupying the premises under the use clause, nor under the Default provisions of the Lease. *Id.* Art. XIV.

In 1959, the parties modified the lease concerning parking lot changes. Suppl. Lease. In 1960, the Ellises sold their strip-center and assigned the lease to Big Tranta, Inc. Compl. ¶ 4. Plaintiff Rothe was the president and fifty percent (50%) shareholder in Big Tranta. In May 1974, upon the expiration of the original fifteen year lease, Hooks and Big Tranta negotiated a new lease, modified to extend for an another twenty years with options for two additional five-year terms. The modified lease provided for an expansion of the Hooks' store and a rent increase. Suppl. Lease ¶ 1 & 4. The base rent rose to $15,000.00 annually, while the percentage rate increased to three percent (3%) of the gross sales in excess of $500,-000.00 per year. *Id.* par.5.

On May 25, 1994, Hooks exercised its first five-year renewal option under the modified lease. Compl. ¶ 4(e). The parties disagree as to when Hooks began contemplating a move to another location and about the negotiations between the two parties in an effort to convince Hooks to sign the new lease. Defendant claims that Hooks began exploring expansion options "near this time," apparently meaning the time of the lease renewal. Tessier Dep. p.19. Neither party has given a specific date, however, Plaintiff reported that rumors of a possible expansion arose in December of 1993. Hooks believed it needed to expand and upgrade its business in order to compete with Walgreens, which was moving into Hooks' market. Tessier Dep. p. 18. Unlike the building at 358 W. Walnut, the buildings occupied by competitors were free-standing with drive-through window services, had larger parking lots, room for front-end displays, and greater visibility. Tessier Dep. pp. 33–34, 124. Additionally, Hooks' competitors were able to sell liquor, which Hooks was not able to do at its leased premises. Tessier Dep. p. 131. Rothe claims that Big Tranta approached Hooks regarding a possible expansion of the existing store, or the building of a new store, but received no response from Defendants after the initial conversation.

In July 1994, Revco acquired Hooks. Compl. ¶ 4e. Although Revco became the owner/operator of the store and treated itself as the lessee, the lease was never assigned to Revco. The parties have stipulated to the fact that Revco is taking full responsibility for the lease and releases Hooks from any liability thereunder.

In the time between the signing of the May 1994 lease and December 1995, Revco made the final decision to move its store from the 358 W. Walnut location. The parties do not agree on whether Revco's predecessor had contemplated the move before it renewed the lease. On December 3, 1995, Revco began operating its new store at 400

W. Walnut, leaving the 358 W. Walnut premises vacant. Compl. ¶ 7. On December 18, 1995, Revco gave Big Tranta formal notice that the store had relocated, but that it would continue to honor its lease with Big Tranta until the December 1999 expiration date. Pl. Aff. ¶ 14. Subsequently, Big Tranta gave formal notice to Revco that it was in breach of the lease arid gave the lessee an opportunity to cure. Id. ¶ 16. On December 28, 1995, Revco responded with a letter affirming that it had vacated the store, but disagreeing that it was in breach of the lease. Id. ¶ 17. As it had promised, Revco continued to pay the $1,250.00 monthly fixed rent and on February 28, 1996, it paid the 1995 percentage of gross sales rent (based on sales until December 3, 1995). Id. ¶ 20. Revco did not pay a percentage rate for 1996. Id. On September 30, 1996, Big Tranta deeded its shopping center and assigned the Revco lease to Rothe. Compl. ¶ 4(f). Rothe has produced statistics demonstrating the proportion of rent represented by the amount paid by Hooks/ Revco as a percentage of gross sales over the past thirty-six years. Pl. Exhibit 117.

## II. STANDARDS

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2554–55, 91 L.Ed.2d 265 (1986); *see United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267–68 (7th Cir. 1990), *cert. denied*, 499 U.S. 923, 111 S.Ct. 1317, 113 L.Ed.2d 250 (1991). Motions for summary judgment are governed by Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials which "set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir.1996). It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir.1996). When the moving party has met the standard of Rule 56, summary judgment is mandatory. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir.1992).

In evaluating a motion for summary judgment, a court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir.1996). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *JPM, Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir.1996). Irrelevant or unnecessary facts do not deter summary judgment—even when in dispute. *Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir.1992). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear

the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir.1996). Cases in which the parties agree that no genuine issues of material facts are in dispute and that the contested issues are purely legal ones are especially appropriate for summary judgment. *Amax Coal Co. v. United Mine Workers of America*, 92 F.3d 571, 574 (7th Cir.1996). Guided by these standards, this Court now considers these present motions for summary judgment.

## III. DISCUSSION

### A. SUMMARY OF ARGUMENTS

At issue is whether Revco breached its lease with Big Tranta, Rothe's predecessor, when it vacated the leased premises, but continued paying the fixed monthly rent. In order to make this determination, the Court must first consider whether the lease contains any covenants, express or implied, that would obligate Revco to continue to operate a business in the leased premises. Rothe claims Revco breached an express covenant to continue operations, an implied covenant to operate, and an implied covenant of good faith.[1] Revco argues that the lease contained no express covenant or implied covenants, and alternatively, if there was a covenant of good faith, Revco did not breach it.

### B. ANALYSIS

*Express Covenant to Continue Operations*

■ Rothe asserts that a number of the clauses in the lease, when read as a whole, create an express covenant to continue to operate. He highlights the "use" clause, providing that the premises be "used and occupied only for operation of a drugstore," as well as the rent, restrictions on subleasing, limitations, exclusivity, and restrictions on fixture removal clauses as the basis for the express covenant. Although Rothe argues in favor of finding an "express" covenant of

continued operations, he is really describing an implied-in-fact covenant under Indiana law.

No Indiana cases recognize an express covenant to perform a certain act in the absence of express language by construing several related covenants. For example, one Indiana appellate court opinion was not willing to find an express covenant to continue operations in the absence of specific language establishing one. *Casa D'Angelo, Inc. v. A & R Realty Co.*, 553 N.E.2d 515 (Ind.Ct.App. 1990).

The Plaintiff rests much of his express covenant argument on case law from other states. Under other states' laws, the plaintiff can find support for his claim that these clauses read together form an express covenant. Apparently, these states refer to what Indiana calls an implied-in-fact covenant as an express covenant. In the 1964 Illinois case of *Simhawk Corp. v. Egler*, the lease contained similar clauses regarding use and rent, with the rent clause requiring a base and a percentage rate. 52 Ill.App.2d 449, 202 N.E.2d 49, 49–50 (1964). The Illinois appellate court concluded from these clauses that the lease contained an express provision requiring continued use of the premises as a retail shoe store. *Id.* 202 N.E.2d at 50. The court explained that if the premises were vacated, the percentage part of the rent would not be paid, and an essential part of the lease would be defeated. *Id.* at 51. The court considered the plain language of the lease provisions, along with the lessee's reporting of the percentage rate of gross sales for the ten months before it vacated the premises, as clear proof that the parties intended to enter into a percentage lease. *Id.*

In a Wyoming case, the supreme court affirmed a trial courts decision to read a lease's provisions as a whole to find an express covenant. *Ayres Jewelry Co. v. O & S Building*, 419 P.2d 628, 631 (Wy.1966). The court explained that the use provision of the lease, which provided that the store be used

---

1. Rothe has also argued that Revco breached the lease when it took over the operations of the store without obtaining assignment of the store's lease. Rothe argues that the assignment required the landlord's consent, but a review of the lease would indicate otherwise. This argument has been mooted by the parties' stipulation that Revco would take responsibility for Hooks' actions and releasing Hooks from liability.

for a jewelry store and "for no other purpose whatsoever" without written consent of the Lessor, provided emphasis to the decision that leaving the store vacant was a prohibited use. *Id.* at 629, 631. As in the Illinois case, there was no express language requiring continued operations, but the court was willing to find an express covenant in the lease.

Under Indiana law, however, it appears that no express covenant to continue operations can be construed from the lease without specific language establishing it. There is no language expressing the covenant outright in the lease at issue. Although out-of-state cases may provide a helpful framework, it is a framework Indiana has not adopted under the guise of express covenants. The cases cited by Rothe were not decided under Indiana law, and under Indiana law there can be no express covenant to continue operations in the lease at issue without specific language to that effect.

### *Implied Covenant of Continued Operations*

The *Casa D'Angelo* court explained that there are two types of implied covenants: implied-in-law and implied-in-fact. 553 N.E.2d at 520. A covenant implied-in-law is "presumed from the relation of the parties and the object to be achieved by the agreement." *Id.* citing *Mercury Investment Co. v. F.W. Woolworth Co.*, 706 P.2d 523, 529, n. 14 (Okla.1985). Without regard for the parties' intentions, public policy provides the basis for the covenant. *Id.* An implied-in-fact covenant is "more akin to the nature of an express covenant because it is raised by inference from words used in the agreement to effect the intention of the parties." *Id.* What Rothe is arguing for in this case is an implied-in-fact covenant.

Revco argues that the lease contract is unambiguous and therefore the Court should not imply any additional terms. Although Rothe does not claim that the agreement is ambiguous, he suggests that the use clause clearly mandates a continued operations covenant. According to Rothe, any disparity between his reading of the lease and Revco's can be resolved by reading all the provisions of the entire lease and harmonizing them, or by considering extrinsic evidence.

Under Indiana law, courts must interpret the language of a contract "so as to ascertain the intent of the parties" and the clauses of the contract "so as to harmonize its provisions." *First Federal Savings Bank of Indiana v. Key Markets*, 559 N.E.2d 600, 603 (Ind.1990). When courts interpret a written contract, they should attempt to determine the intent of the parties at the time of formation by examining the language used to express their rights and duties. *Id.* If the contract is clear, the court should require performance consistent with the contract. *Id.* at 604. When the contract has ambiguous or uncertain terms, however, the court may have to look to extrinsic evidence or construe all the contract provisions. *Id.* The Indiana appellate court adds that, "parties to a contract have the right to define their mutual rights and obligations, and a court may not make a new contract or supply omitted terms while professing to construe the contract." *Johnson v. Sprague*, 614 N.E.2d 585, 588 (Ind.Ct.App.1993) (deciding to imply a contract for sale of a cottage) (citing *Rodman v. City of Wabash*, 497 N.E.2d 234, 240 (Ind.Ct.App.1986)). *See also Bethlehem Steel Corp. v. Sercon Corp.*, 654 N.E.2d 1163, 1168 (Ind.Ct.App.1995); *Ochoa v. Ford*, 641 N.E.2d 1042, 1044 (Ind.Ct.App. 1994).

In circumstances similar to the ones at issue here, the Indiana appellate court refused to imply a covenant to continue operations once it found the lease to be unambiguous. *Keystone Square Shopping Center Co. v. Marsh Supermarkets, Inc.*, 459 N.E.2d 420, 423 (Ind.Ct.App.1984). Although the lease at issue was a base and percentage lease, the leased premises was vacated for a time by Marsh grocery store and then reopened by Marsh as a smaller discount grocery store. *Id.* at 422. In refusing to imply a covenant, the court emphasized that the parties had relatively equal bargaining power at the time of negotiations, neither party was a novice in the business, and the lease was a sophisticated document containing unambigu-

ous and precise language. *Id.* at 423. Additionally, Marsh had the power to assign the lease without Keystone's consent. *Id.* Given the clear language of the negotiated document, the court held that it would "not imply a covenant which would restrict one party's freedom to conduct its own business as it sees fit." *Id.*

In a more recent case, the Indiana appellate court refused to imply a covenant to generate the percentage rent, but acknowledged that an implied covenant may be appropriate under certain circumstances. *Casa D'Angelo*, 553 N.E.2d at 521. In *Casa D'Angelo*, after months of declining business, the lessee closed its restaurant four months before its lease expired. *Id.* at 517. The declining business was attributed to the owners opening up a similar restaurant in the area and decreasing the hours, services, and personnel at this location. *Id.* at 517–18. The landlord, A & R Realty Co., sought a finding of an implied covenant to generate percentage rent through the duration of the lease. Casa D'Angelo had a lease similar to Revco's lease. It paid a base rent plus a percentage of its gross receipts over $ 20,000.00. *Id* at 517. The Casa D'Angelo "use" clause required that the premises be used "for the operation of a restaurant facility and for no other purpose" without the written consent of the landlord. *Id.* at 520. It also had a "business hours" clause requiring Casa D'Angelo to keep the premises opened for business hours during normal restaurant business hours. *Id.* When the landlord, A & R, sued Casa D'Angelo for breach of the "implied" covenant, the Indiana appellate court declined to imply a covenant that had the effect of requiring Casa D'Angelo to continue operating so as to generate rent.

Although A & R's request was different from Rothe's, the two are analogous. In its discussion the court stated that the use provision in the Casa D'Angelo lease did not require the restaurant to operate on the premises; it merely prohibited the use of the premises for other purposes. A Seventh Circuit case echoed that holding when it contemplated a use clause similar to the one in Revco's lease and found that the clause did not restrict a tenant from keeping the premises vacant. *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 603 (7th Cir.1995). The court noted that "allowing a store to remain vacant is different from opening a hardware or music store on the leased premises." *Id.*[2] As with the use provision in the *Casa D'Angelo* case, the provision here should be interpreted as prohibiting the uses specified in the lease, but not requiring the tenant to occupy and use the premises.

The *Casa D'Angelo* court discussed implied-in-fact covenants and suggested that they are generally not favored in the law. *Id.* (citing *Keystone Square Shopping Center Co.*, 459 N.E.2d at 423). However, the court explained that a covenant may be implied if

(1) the obligation arises from the parties' presumed intention as gathered from the contract's language, or appears from the contract as a whole, to be indispensable to give effect to the parties' intent; and (2) it is so clearly within the parties' contemplation that they don't deem it necessary to express it.

*Id.* at 521. This opinion was written before the Indiana Supreme Court's *First Federal Savings Bank of Indiana* decision, which requires courts to enforce as written an unambiguous contract.

The *Keystone Square* court went on to explain that other jurisdictions have refused to find an implied covenant to continue operations when the base rent amount is substantial, but when it is insubstantial courts have implied a covenant to continue operations. *Id.* The court suggests that although "substantial" rent has been defined as more than "nominal" rent, the modem trend is to define substantial as the fair rental value for the property. *Casa D'Angelo*, 553 N.E.2d at 521. Additionally, some jurisdictions have implied a covenant to continue operations even when base rent is substantial but provisions of the lease and the surrounding circumstances at the time of execution indicate that continued operation of the business was

---

**2.** Whether keeping the store vacant was a prohibited use was a claim still pending in the district court at the time of the Seventh Circuit's decision. *Serfecz*, 67 F.3d 591, 603 (7th Cir. 1995).

an important consideration for the lease. *Id.* The provisions and circumstances that have been taken into account include whether the leased store is a magnet store for the shopping center, *Walgreen Ariz. Drug Co. v. Plaza Ctr. Corp.*, 132 Ariz. 512, 647 P.2d 643 (1982), and whether the parties based the lease agreement on past performance of a specific type of store. *Selber Bros., Inc. v. Newstadt's Shoe Stores*, 194 La. 654, 194 So. 579 (1940).

Other jurisdictions have been willing to imply a covenant to continue operations when the base rent is insubstantial. The Iowa Supreme Court has held that a covenant could be implied when the tenant "is obligated to pay a significant part of the rental as a percentage of the tenant's gross receipts." *East Broadway Corp. v. Taco Bell Corp.*, 542 N.W.2d 816, 819 (Iowa 1996). The lower court instructed the jury that rent is primarily based on a percentage of gross sales when the base rent is insubstantial, explaining that "insubstantial" is a relative term that is not easily defined. *Id.* at 820. In denying a motion for a directed verdict, the Iowa court explained that the jury needed to decide what the parties intended and whether the percentage rent was insubstantial.[3] *Id.* at 821.

In a different type of implied covenant case, the Oklahoma Supreme Court refused to imply a covenant to diligently operate the business into a base and percentage lease where the four corners of the lease did not show the base rent to be nominal. *Mercury Investment Co.*, 706 P.2d at 532. Under the lease in question the tenant had not paid any percentage rent because its gross sales never reached the dollar amount specified to trigger the clause. *Id.* at 527. While acknowledging that if the base rent were nominal it may be appropriate to imply a covenant, the Oklahoma court held the base rent to be more than nominal. *Id.* at 532. The court also emphasized that there was no established period of past experience on which the parties could determine the proper rent as the lease involved a new venture. *Id.*

Rothe relies heavily on another district court opinion in order to suggest that because his base rent amount was insubstantial, a covenant should be implied. *See Massachusetts Mutual Life Insurance Co. v. Associated Dry Goods Corp.*, 786 F.Supp. 1403 (N.D.Ind.1992). In that case, Massachusetts Mutual owned the mall in which Associated Dry Goods Corp., "ADG", owners of Ayres, leased a store. When ADG vacated the store, there were twelve years left on the lease. *Id.* at 1407. The Ayres store had occupied one sixth of the mall's space, which made it an anchor. *Id.* Unlike the Revco lease, the Ayres' lease provided only for base rent. However, the district court likened the function of an anchor store to the obligation to pay percentage rent. *Id.* at 1423. The use clause also differed from the clause in Revco's lease, as the Ayres' lease required that "during the continuance of this Lease, [the premises] shall be used and occupied by Lessee for the purpose of operating a merchandising business." *Id.* at 1421, n. 23. As in Revco's lease, Ayres could not sublet or assign without the landlord's written consent. *Id.* at 1421 & n. 28.

The court explained that under Indiana law, "[I]f the parties' intentions (at the time of formation) can be ascertained clearly by the contract language, Indiana courts recognize and enforce the agreement." *Id.* at 1421 (citing *Myers v. Myers*, 560 N.E.2d 39, 43 (Ind.1990)). However, the court found that a covenant to continue operations could be implied, citing *Casa D'Angelo*. *Id.* It then distinguished the Ayres' lease from the Casa D'Angelo lease, which did not demand continuing operations, by stressing the "during the continuance of the lease" language found in Ayres' use clause. The court also stressed that the Casa D'Angelo situation differed as Casa D'Angelo was one of only two tenants in a strip mall and therefore it was not relied upon to enhance the value of the surrounding property. *Id.* at 1422. In contrast the Ayres store was one of three anchor stores in the mall and was depended on to attract shoppers for all. *Id.* at 1407.

**3.** The lease in *East Broadway* contained a use clause similar to Revco's and also prohibited subleasing or assignment without the landlord's consent.

The court then examined the base rent ADG paid and determined it to be insubstantial. *Id.* at 1423. Although no evidence was introduced on the fair market value for the property, the court accepted uncontradicted testimony that the rent was well below market value. *Id.* In finding that an implied covenant existed, the court emphasized that the lease provisions and surrounding circumstances at the time of formation of the contract demonstrated that the parties had contemplated continued use. *Id.* The circumstances it considered included Ayres being an anchor store, the fact the developer personally negotiated the lease with ADG's predecessor, and the fact that Ayres had veto power concerning the entrance of other tenants into the mall. *Id.*

Revco suggests that applying the holding of *Massachusetts Mutual* to this lease would be inappropriate because the ADG lease had the "during the continuance of the lease" use clause, the court had looked into the adequacy of ADG's consideration, and it had relied upon the *Casa D'Angelo* decision, which Revco argues is no longer valid after the *First Federal Savings Bank of Indiana* decision. Revco's points are well taken.

Neither party claims that the contract provisions, which constitute the lease, are ambiguous. Rothe believes the clear language of the contract implies a covenant, while Revco argues that the clear language of the contract proves there was no covenant and this Court should not imply one. However, ambiguity of the contract is not the dispositive issue. Instead of dealing with an ambiguous contract, the parties here are dealing with an unambiguous contract that contains a gap. The ramifications of a tenant vacating the premises were not covered in the lease. Under Indiana law, if the contract is clear the court should require performance consistent with the contract and should not supply new or omitted terms. *First Federal Savings Bank of Indiana,* 559 N.E.2d at 603; *Johnson,* 614 N.E.2d at 588. The lease at issue may be read so as to harmonize its provisions, which are not in conflict. The parties have merely omitted any agreement about what to do if the lessee vacates the premises before the lease expires. The

Indiana cases suggest that the Court should not imply this term for the parties.

Although the *Casa D'Angelo* case suggests that a covenant may be implied when the presumed intent of the parties makes the provision indispensable to giving effect to the agreement or when the provision was so clearly in contemplation of the parties that there was no need to include it, neither of those situations apply here. When the lease was first drafted in 1958 it involved a new venture, which as several courts have suggested, does not allow for any expectation regarding a percentage rent. Therefore it would be difficult to argue that a covenant to continue operations was integral to giving effect to the parties intentions or so clearly in contemplation at the time of execution as to warrant its inclusion. Plaintiff may argue that given the fact this lease is based on one of two renewals, the situation is unlike the new venture cases where there was no expectation of a significant percentage rent. Rothe did not raise this argument. Despite past performance, however, percentage rent year to year is not guaranteed with any lessee. The Plaintiff could have made clear his intention that percentage rent was the most important aspect of the rent by including a continued operation clause, especially given the fact that the renewal lease was signed as recently as May of 1994. At that time, given the Lease's annual gross sales report requirement, Plaintiff presumably had available the statistics regarding the percentage rent. Additionally, if Plaintiff knew or had even heard rumors to the effect that Defendant was looking to expand or move the store, as he claims he had, the importance of putting a continued operation clause in writing seems even more apparent.

Plaintiff has presented evidence tending to prove the relative substantiality of the base rent by financial statistics that show the percentage rent accounted for up to 88% of the rent paid. However, no evidence as to the fair rental value of the property was provided. Although Plaintiff may be able to reasonably argue that the base rent was insubstantial, the issue of the substantiality of the base rent may not be reached until the court has a need to construe the contract beyond

its facial provisions. Given the clarity of the Lease's provisions, this Court has no reason to inquire as to the substantiality of that rent. Whenever possible, a court should avoid interpreting a contract through the lens of hindsight.

### Implied Covenant of Good Faith

In *First Federal Savings Bank of Indiana v. Key Markets, Inc.* the Indiana Supreme Court held that there was no implied duty to act in good faith in a lease contract. 559 N.E.2d at 604. In that case, the lease between the two parties had required the landlord's consent before assignments or subleases could be made. *Id.* at 601. Key Markets requested First Federal's consent to assign the parking lot lease and common area easement and First Federal refused. *Id.* The court looked to the clear language of the contract, which it perceived as unambiguous. *Id.* at 603–04. It explained that only when the parties' intentions are unclear, because of an ambiguous contract, may the court consider whether the parties were acting in good faith. *Id.* at 604.

Thus, under Indiana law, only when a contract is ambiguous or contains uncertain terms may the intent of the parties be determined by extrinsic evidence or by examining the contract provisions as a whole. *Id.* at 604. Under these circumstances, a court may presume the parties acted in good faith when it is trying to discern the parties' intentions. *Id.* at 604. According to the court, "It is not the province of courts to require a party acting pursuant to such a contract be 'reasonable,' 'fair,' or 'show good faith' cooperation," as this would require courts to exceed the "bounds of judicial duty and responsibility" and place courts at the negotiation table. *Id.* Other Indiana decisions have held that there is no requirement of implying a general duty of good faith and reasonableness in every contract. *See Pardieck v. Pardieck,* 676 N.E.2d 359 (Ind.Ct.App.1997).

The Defendant further contends that even if there was a covenant of good faith, it did not breach it. In *F.W. Woolworth Co. v. Plaza North, Inc.,* an Indiana appellate court explained that although it agreed with lessor that there was an implied covenant to act in good faith so as not to deprive the lessor of his percentage rent, the lessee had not acted in bad faith. 493 N.E.2d 1304, 1311 (Ind. App.1986). Due to a "severe business climate" Woolworth had closed its stores nationwide, the Defendant's store included. *Id.* at 1311. The court stressed that no bad faith was involved as the closing was a business decision, not based in anyway on the percentage clause in the lease. *Id.*

In his arguments concerning good faith, Rothe again relies primarily on out-of-state cases. For example, he cites *Lagrew v. Hooks SupeRx, Inc.,* in which a Kentucky district court implied a covenant of continuous operation and held an implied covenant of good faith to be read into the contract. 905 F.Supp. 401, 407–08 (E.D.Ky.1995). However, that decision was based entirely on Kentucky law. *Id.* Plaintiff's only cite to Indiana law is to part of an earlier *First Federal Savings Bank of Indiana* case, which has since been reversed.

Under the *First Federal Savings Bank of Indiana* decision, it appears clear that Indiana courts are not willing to imply a covenant of good faith into an unambiguous contract. 559 N.E.2d at 604. As previously discussed the Lease does not appear ambiguous, it merely has a missing term. Without a finding of an ambiguous lease, this Court will not imply a covenant of good faith.

Even if such a covenant were implied, however, Defendant may have a valid argument that it did not breach it. Revco has argued, and provided evidence, that the decision to move was driven by business considerations, not a desire to deprive Rothe of rent. On the other hand, Rothe has based much of his argument on out-of-state cases and on the contention that the move violated the "spirit" of the Lease. If Hooks/Revco had known that it was going to move when it signed the May 1994 lease it may have been bad faith to renew the lease, knowing that Rothe would lose the percentage rent and would not be able to lease to another drug store, thereby reducing the competition. Besides the fact that Rothe did not provide sufficient evidence to create a genuine issue on this point, bad faith only becomes an issue if a good faith

clause was in the lease. No such clause is stated outright in the document, nor will the Court imply such a covenant, as stated above. Thus, Rothe's arguments regarding a breach of the covenant of good faith must fail.

## IV. CONCLUSION

Defendant Revco met its burden of showing that plaintiff Rothe, who has the burden of proof, has failed to provide sufficient evidence from which the Court may find a genuine issue of material fact. The evidence fails short of establishing the existence of an express or implied covenant of continued operations or good faith. Therefore summary judgment in favor of Revco and against Rothe should be and hereby is **GRANTED.** Rothe's motion for summary judgment is hereby **DENIED.** No triable issues remain for a jury trial and Revco is granted judgment as a matter of law.